UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BLADEROOM GROUP LIMITED, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., et al.,<br><br>Defendants. | Case No. 5:15-cv-01370-EJD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 114 |

This is a case about data centers, "which are the buildings that house the vast arrays of computer servers that form the backbone of the internet and the high-technology economy." Second Am. Compl. ("SAC'), Dkt. No. 107, at ¶ 1. Plaintiffs BladeRoom Group Limited ("BRG") and Bripco (UK) Limited ("Bripco")[1] are two English companies who allege that Defendants Facebook, Inc. ("Facebook"), Emerson Electric Co. ("Emerson"), Emerson Network Power Solutions, Inc. and Liebert Corporation[2] enticed them to reveal their data center designs and construction methods with promises of acquisition and partnership, only to then copy those designs and methods and pass them off as their own.

---

[1] In this order, BRG and Bripco are referred to collectively as "Plaintiffs."

[2] Emerson Electric Co., Emerson Network Power Solutions, Inc. and Liebert Corporation are referred to collectively as the "Emerson Defendants."

1
Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

Federal jurisdiction arises pursuant to 28 U.S.C. §§ 1331 and 1332. Presently before the court is Facebook's Motion to Dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 114. Plaintiffs have filed written opposition to this motion. Having carefully considered the parties' arguments, the court concludes that most but not all of the SAC withstands a Rule 12(b)(6) review. Thus, Facebook's motion will be granted in part and denied in part for the reasons explained below.

## I. BACKGROUND

### A. Plaintiffs and the BladeRoom Technology

Plaintiffs developed and perfected a method for manufacturing and installing a type of pre-fabricated data center known as a "BladeRoom." Id. at ¶ 4. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Id. at ¶ 26. Plaintiffs built the first BladeRoom in 2009, and have since built over 40 BladeRooms on four continents. Id. at ¶ 27.

Though some of the techniques used to build a BladeRoom are publicly disclosed, Plaintiffs keep others as confidential trade secrets and limit the release of this information in several ways. Id. at ¶¶ 28, 31. They ensure that private disclosure to potential clients, suppliers and others is covered by non-disclosure agreements. Id. at ¶ 31. The computer systems containing the trade secrets are password-protected and the facilities where they are stored are physically secured. Id. Additionally, employee access to trade secrets is limited to only those that need to know of them and is subject to confidentiality agreements. Id.

Bripco is the legal owner, and BRG is the licensee, of all right, title and interest in the trade secrets and other confidential information developed by BRG, including the BladeRoom technology. Id. at ¶ 5.

2
Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

**B.     BRG Discusses BladeRoom Technology with Emerson and Facebook**

In August 2011, BRG entered into ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Id. at ¶ 34. Emerson executed a non-disclosure agreement before any substantive discussions occurred, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Id. at ¶ 35. BRG then hosted a meeting for several Emerson executives at its factory in England in September, 2011, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Id. at ¶ 47. Emerson later informed BRG in October, 2011, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Id. at ¶ 48.

BRG also began discussing the BladeRoom technology with Facebook in October, 2011. Id. at ¶ 37. In connection with those discussions, BRG and Facebook entered into a non-disclosure agreement ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Id. at ¶ 40. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, Facebook "urgently requested" a proposal to supply BladeRooms for a data center in North Carolina. Id. at ¶ 49. BRG provided the proposal in November, 2011, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Id. According to BRG, "[f]eedback from Facebook was positive, and Facebook quickly began asking to learn even more details about" BladeRooms. Id. at ¶ 50. BRG representatives met with Facebook in California, and two Facebook representatives met with BRG in England in March, 2012. Id. at ¶ 51. During this trip, BRG took the Facebook representatives on a tour of an operating BladeRoom and provided them with additional confidential information. Id. Subsequently, "Facebook continued to request yet more detailed confidential information from BRG," and "suggested that the next step should be for a team of Facebook design and engineering staff to travel to BRG in England for an in-depth workshop with BRG's technical teams to enable Facebook to learn more . . . ." Id. at ¶ 52.

BRG alleges that soon after the March, 2012, meeting in England, one of the attending Facebook representatives met with an Emerson Network Power executive ▇▇▇▇▇▇▇▇▇▇

. Id. at ¶ 53. ▮▮▮, Emerson contacted BRG and sought to reopen discussions, to which BRG agreed. Id. Emerson told BRG, however, that a group of individuals other than the ones who had visited BRG in 2011 ▮▮▮ ▮▮▮. Id. Emerson proposed that several of its representatives visit BRG's facilities in June, 2012. Id. at ¶ 54.

On May 29th and May 30, 2012, BRG attended a meeting with Facebook at its data center campus in Prineville, Oregon, and was told the purpose of the meeting was to "survey and physically see the functionality of a Facebook data center and meet Facebook's lead architect and engineers." Id. at ¶ 56. Third party architects and contractors also attended. Id. Facebook told BRG it would request a proposal for an expansion of the Prineville data center campus and asked BRG to present and discuss BladeRoom technology, which it did. Id. at ¶ 57. BRG alleges that unbeknownst to it at the time, Facebook had already agreed that its construction contractor ▮▮▮ ▮▮▮. Id. at ¶ 58.

BRG's previously discussed in-depth workshop with Facebook occurred in England between June 19th and June 21, 2012, during which BRG revealed additional confidential information. Id. at ¶¶ 60, 61. A meeting between BRG and Emerson, during which BRG also revealed confidential information, occurred at the same time. Id. at ¶ 64. To maintain the confidentiality of the respective discussions, BRG ensured the two companies' representatives were separated during their visits. Id.

But despite BRG's efforts, representatives from Facebook and Emerson did engage in a "pre-arranged, clandestine meeting" in London on June 21, 2012, and "compared notes" on what each had learned from their meetings with BRG. Id. at ¶ 68. Facebook also continued to indicate an interest in partnering with BRG and requested more information and proposals. Id. at ¶ 69.

**C.     Facebook and Emerson Allegedly Misappropriate the BladeRoom Technology**

Facebook never placed an order for BladeRooms. Id. at ¶ 71. Instead, BRG alleges that Facebook and Emerson ▮▮▮

1  ████████████████████████████████████████ Id. at ¶ 74. ████

2  ███████████████████████████████████████████████████████████

3  ████████████████████████████████████ Id. at ¶¶ 75, 80.  On January 16, 2013, Emerson publicly announced that it was launching a new business focusing on "serving the needs of massive data centers" using "customized, highly scalable, and often modular infrastructures." Id. at ¶ 78. And in May, 2014, Facebook announced it had chosen Emerson to construct a pre-fabricated, modular data center in Sweden, which it alleges will be constructed using appropriated BladeRoom technology. Id. at ¶ 113.

### D. Facebook's Disclosure of BRG Confidential Information

BRG alleges that after Emerson's announcement, Facebook began revealing BRG's confidential information through its initiative called the "OpenCompute Project," the goal of which "is to give the public 'full access to the[] specifications' used by Facebook in its data centers in order to 'spark a collaborative dialogue" about how to improve its approach to data centers." Id. at ¶¶ 83, 84. BRG alleges that on January 28, 2014, a Facebook representative made a public presentation at an OpenCompute forum and referred to the BladeRoom technology as one the "rapid deployment data center" ("RDDC") method created by Facebook. Id. at ¶ 89. The same Facebook representative also authored and published an OpenCompute blog post that allegedly included details of the BladeRoom technology. Id. at ¶ 100.

### E. The Instant Action

Plaintiffs initiated this action on March 23, 2015, and the court granted in part and denied in part Facebook's motion to dismiss the original complaint. Dkt. No. 59.  Plaintiffs then filed an amended complaint and, later, the SAC. Dkt. Nos. 62, 107.  This motion followed.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted).

The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." Id. at 556-57. A complaint that falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).

When deciding whether to grant a motion to dismiss, the court must generally accept as true all "well-pleaded factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009). The court must also construe the alleged facts in the light most favorable to the plaintiff. See Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am., 768 F.3d 938, 945 (9th Cir. 2014) (providing the court must "draw all reasonable inferences in favor of the nonmoving party" for a Rule 12(b)(6) motion). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678.

Also, the court usually does not consider any material beyond the pleadings for a Rule 12(b)(6) analysis. Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). Exceptions to this rule include material submitted as part of the complaint or relied upon in the complaint, and material subject to judicial notice. See Lee v. City of Los Angeles, 250 F.3d 668, 688-69 (9th Cir. 2001).

### III. DISCUSSION

Facebook moves to dismiss all the claims asserted in the SAC. Each is discussed below.

#### A. Misappropriation of Trade Secrets

The California Uniform Trade Secrets Act ("CUTSA"), codified at California Civil Code § 3426 et seq., "creates a statutory cause of action for the misappropriation of a trade secret." Brescia v. Angelin, 172 Cal. App. 4th 133, 143 (2009). A "trade secret" is "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or

to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). "Misappropriation" includes the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Cal. Civ. Code § 3426.1(b). "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" but excludes "[r]everse engineering or independent derivation alone." Cal. Civ. Code § 3426.1(a).

To state a claim under CUTSA, a plaintiff must demonstrate: "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." Cytodyn, Inc. v. Amerimmune Pharms., Inc., 160 Cal. App. 4th 288, 297 (2008).

### i. Ownership of Trade Secrets

Facebook argues that neither BRG nor Bripco can maintain a claim for misappropriation of trade secrets for different reasons. As to BRG, Facebook contends its status as a licensee does not satisfy the ownership element of the claim. As to Bripco, Facebook argues the SAC does not describe how it was damaged by the alleged misappropriation. These arguments are unconvincing.

#### *a. BRG*

In arguing that misappropriation claims are properly limited only to owners and not licensees, Facebook focuses primarily on authority that simply echoes the claim's elements. For example, Facebook relies on the district court's opinion in Nextdoor.com, Inc.v. Abhyanker, No. C-12-5667 EMC, 2013 U.S. Dist. LEXIS 101440, at *27, 2013 WL 3802526 (N.D. Cal. July 19, 2013), in which the court observed that "[i]n order to bring a viable claim for misappropriation of trade secrets, [the plaintiff] must own the trade secrets in question." This statement, however, is not reflective of the legal proposition for which Facebook cites it. Instead, the statement's

7
Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

supporting citation denotes it is merely recognition of the first element of a prima facie misappropriation claim under CUTSA, which is traditionally and perhaps over-simplistically phrased in terms of "ownership." Nextdoor.com, 2013 U.S. Dist. LEXIS 101440, at *27 (citing Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658, 1665 (2003)).  As such, neither Nextdoor.com nor the state appellate case it cites hold that trade secret misappropriation claims can only be asserted by an owner, and Facebook has not cited any other authority from California federal or state courts explicitly finding as much.

This issue has been addressed by courts outside this circuit, however.  They have "generally come to the same conclusion: a party has standing to bring a trade secrets claim if it has *possession* of the trade secret." Williams-Sonoma Direct, Inc. v. Arhaus, LLC, 304 F.R.D. 520, 527 (W.D. Tenn. 2015) (emphasis added); accord Metso Minerals Indus. v. FLSmidth-Excel LLC, 733 F. Supp. 2d 969, 978 (E.D. Wis. 2010).  Those courts reason that "fee simple ownership" as an element of a trade secret misappropriation claim "may not be particularly relevant" because "the 'proprietary aspect' of a trade secret flows, not from the knowledge itself, but from its secrecy." DTM Research, L.L.C. v. AT&T Corp., 245 F.3d 327, 332 (4th Cir. 2001).  "It is the secret aspect of the knowledge that provides value to the person having the knowledge." Id. "While the information forming the basis of a trade secret can be transferred, as with personal property, its continuing secrecy provides the value, and any general disclosure destroys the value." Id.

The logic underlying these out-of-circuit opinions is persuasive and equally applicable here.  Since CUTSA defines a trade secret as information that "[d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use," the better focus for determining whether a party can assert a misappropriation claim is on that party's possession of secret knowledge, rather than on the party's status as a true "owner." See DaimlerChrysler Servs. v. Summit Nat'l, No. 02-71871, 2006 U.S. Dist. LEXIS 32049, at *26-27, 2006 WL 1420812 (E.D. Mich. May 22, 2006),

8
Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

aff'd, 289 F. App'x 916 (6th Cir. 2008); see also DTM Research, 245 F.3d at 332 ("[O]ne 'owns' a trade secret when one knows of it, as long as it remains a secret.").

Here, though Plaintiffs allege that Bripco owns the trade secrets and BRG is a licensee, they also allege that Plaintiffs' licensing arrangement obligates BRG to maintain the confidentiality of the secrets. SAC, at ¶ 30. In addition, Plaintiffs have allegedly employed several mechanisms to limit the public disclosure of confidential information. Id. at ¶ 31. The court finds these allegations sufficiently demonstrate that BRG possesses non-disclosed knowledge and may therefore "demand remedies as provided by [CUTSA] against those who 'misappropriate' the knowledge," even though it is a licensee. DTM Research, 245 F.3d at 332. Facebook's challenge to BRG's trade secret misappropriation claim based on lack of ownership is therefore rejected.

### b. Bripco

Facebook argues Bripco's misappropriation claim must be dismissed because the damages allegations are inadequately pled under Rule 8. Specifically, Facebook takes seemingly contradictory positions that, on the one hand, "the SAC contains no factual allegations as to how [Bripco] . . . was damaged," and on the other, that the allegation describing how Bripco was harmed is too conclusory. This argument fails.

A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. The Ninth Circuit employs a two-step process for evaluating a pleading for plausibility:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

Eclectic Props. E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 996 (9th Cir. 2014).

"In all cases, evaluating a complaint's plausibility is a 'context-specific' endeavor that requires courts to 'draw on . . . judicial experience and common sense.'" Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting Eclectic Props., 751 F.3d at 995-96).

Looking to the SAC, Facebook's first position that the pleading lacks any allegations of Bripco's damages is unsupportable because it does, in fact, contain such an allegation. And its second position fares no better, because Plaintiffs allege in the SAC that Facebook "damaged the market for [Bripco's] licensing of its trade secret to others." SAC, at ¶ 137. That allegation is sufficient under Rule 8 because it is more than just a recitation of the damages element; to the contrary, the allegation notifies Facebook of a particular form of damages at issue in this action that can be explored through discovery. Moreover, this allegation, if assumed true, suggests Bripco's entitlement to relief because it satisfies the third element of a misappropriation claim. Though Facebook would like more detail about how its purported conduct harmed Bripco's licensing market, those specifics are not required at the pleading stage. See StreamCast Networks, Inc. v. IBIS LLC, No. CV 05-04239, 2006 U.S. Dist. LEXIS 97607, at *16, 2006 WL 5720345 (C.D. Cal. May 2, 2006) ("Under Rule 8, the fact of damage-and the type of damage-can be alleged in conclusory terms."); see also Mintel Learning Tech., Inc. v. Ambow Educ. Holding, Ltd., No. 5:11-CV-01504-EJD, 2012 U.S. Dist. LEXIS 30953, at *7, 2012 WL 762126 (N.D. Cal. Mar. 8, 2012) ("While omitting facts as to a necessary element of the cause of action may often render a claim insufficient, the failure to specifically plead the amount of harm or the mechanism of causation is not necessarily fatal to a complaint.").

In sum, Bripco's damages allegations are not so implausible or speculative so as to render them inadequate under Rule 8.

### ii. Secrecy

Turning to the second element of a misappropriation claim, Facebook argues the SAC's allegations show that Plaintiffs failed to undertake reasonable efforts to maintain the secrecy of the BladeRoom technology because they disclosed it to third-party architects and contractors at the

10
Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

meeting in Prineville, Oregon in May, 2012. In response, Plaintiffs emphasize the SAC's allegation that those third parties were ██████ of Facebook and ██████ ██████ SAC, at ¶ 57. They also argue that a decision on the reasonableness of Plaintiffs' efforts to maintain the secrecy of their trade secret information is a fact that question that cannot be decided on a motion to dismiss.

It is true that "[s]ecrecy is an essential characteristic of information that is protectable as a trade secret." Altavion, Inc. v. Konica Minolta Sys. Lab., Inc., 226 Cal. App. 4th 26, 57 (2014). It is also well established that "'[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.'" Id. (quoting In re Providian Credit Card Cases, 96 Cal. App. 4th 292, 304 (2002)).

But at the same time, CUTSA's definition of what can constitute a "trade secret" does not require that confidential information be kept completely clandestine or mandate the use of non-disclosure agreements in all instances. In fact, CUTSA does not dictate a particular level of secrecy needed to maintain the character of information as a trade secret. Instead, CUTSA requires efforts at secrecy that are "reasonable under the circumstances." Cal. Civ. Code § 3426.1(d). Moreover, it includes the acquisition of information by misrepresentation as a type of "improper means" that can constitute misappropriation. Cal. Civ. Code § 3426.1(a).

In light of how these key terms are defined, Plaintiffs' argument is the more persuasive - at least for this motion. Construing the SAC in Plaintiffs favor, they contend that Facebook essentially enticed BRG to disclose confidential information to Facebook and third parties in May, 2012, by misrepresenting the true purpose of the meeting. To that end, Plaintiffs allege that Facebook told BRG that it would be asked to submit a bid for an expansion of the Prineville data center, while in actuality Facebook had already agreed that its own contractors would submit a substantially lower bid for the same work. SAC, at ¶¶ 57, 58. The allegations also suggest that BRG believed the third parties attending the meeting were ██████

11
Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

1    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆, and it did not employ additional confidentiality measures for that

2    reason. Id. at ¶ 57.  Thus, though Facebook's argument regarding voluntary disclosure is certainly

3    appealing and may ultimately prevail depending on what is revealed through an investigation of

4    the facts, Plaintiffs theory that its efforts at secrecy were reasonable under the circumstances is

5    plausible enough to overcome a motion to dismiss.

6          Furthermore, Facebook's assertion that the misappropriation claim is "defective" because

7    the SAC "does not distinguish the information that was disclosed from any protectable trade

8    secrets" is misplaced and the case it relies on, Top Agent Network, Inc. v. Zillow, Inc., No. 14-cv-

9    04769-RS, 2015 U.S. Dist. LEXIS 161556, 2015 WL 7709655 (N.D. Cal. Apr. 13, 2015), is

10   inapposite.  This argument presumes either facts not alleged or the validity of a preceding

11   argument: that whatever information was disclosed at the May, 2012, meeting no longer qualifies

12   as a trade secret.  But Plaintiffs do not allege that BRG's presentation consisted of protectable and

13   non-protectable information, as the plaintiff did in Top Agent Network, and the court has rejected

14   the argument that the SAC fails to plausibly allege reasonable efforts at secrecy.

15         Accordingly, the trade secret misappropriation claim is not subject to dismissal because of

16   allegations describing the disclosure of confidential information to third parties.

### iii. Inadequate Allegations of Misappropriation

18   In its final challenge to the misappropriation claim, Facebook argues it must be dismissed

19   because Plaintiffs have not articulated what trade secrets allegedly provided to Facebook were

20   actually misappropriated.  As the court understands it, Facebook advocates for a level of pleading

21   requiring the plaintiff to specifically identify in a complaint the mechanism of misappropriation

22   for each and every asserted trade secret.  The court disagrees that Rule 8 requires that type of

23   detail.  See Eclectic Props., 751 F.3d at 996.

24         Here, the SAC contains enough factual information to provide Facebook with "fair notice"

25   of how and when it allegedly misappropriated all of the trade secrets described in that pleading,

26   such that additional allegations on that topic are not mandated by Rule 8.  The current allegations

United States District Court
Northern District of California

adequately inform Facebook of what is asserted against it for the purpose of proceeding with discovery.

Since all of its arguments are unsuccessful, Facebook's motion to dismiss the misappropriation of trade secrets claim will be denied.

### B. Lanham Act

Plaintiffs allege that Facebook violated § 43(a) of the Lanham Act by falsely claiming that it and its contractors performed the architectural, engineering, and design services that led to the RDDC. Facebook moves to dismiss this claim on two grounds. First, it argues that § 43(a) does not prohibit the copying of ideas. Second, it argues the SAC is devoid of facts alleging a commercial use. Facebook is correct on both points.

Section 43(a) of the Lanham Act imposes liability on "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact," which is likely to confuse or deceive as to the origin of those goods and services. 15 U.S.C. § 1125(a). This language is broad enough to permit "reverse passing off" claims, where "[t]he producer misrepresents someone else's goods or services as his own." Dastar v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28-30 (2003). But it also has two notable and important limitations.

First, the Supreme Court has held that the phrase "origin of goods" only "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." Id. at 37. This is because the protections of the Lanham Act "were *not* designed to protect originality or creativity" in the same way as copyright and patent laws. Id. (emphasis preserved).

Second, the Lanham Act only applies in circumstances involving a "commercial transaction" in which "the trademark is being used to confuse potential consumers." Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 676 (9th Cir. 2005). Indeed, "'the Lanham Act seeks to

prevent consumer confusion that enables a seller to pass off his goods as the goods of another . . . . Trademark infringement protects only against mistaken *purchasing decisions* and not against confusion generally.'"  Id. at 677 (quoting Lang v. Ret. Living Publ'g Co., Inc., 949 F.2d 576, 582-83 (2d Cir. 1991)) (emphasis preserved).

These limitations fatally undermine Plaintiffs' "reverse passing off" claim.  Though they argue the claim is based on a misrepresentation about the origin of the services needed to create the BladeRoom technology rather than the technology itself, Plaintiffs fail to allege or convincingly argue exactly how Facebook is offering those services in a commercial transaction, such that there is opportunity for consumers to make "mistaken purchasing decisions" of those services.  Id. at 679 ("[T]he appropriate inquiry is whether [the defendant] offers *competing* services to the public.") (emphasis preserved).  The conclusory allegation that Facebook "competes with BRG as a data center design provider and innovator" does not provide that explanation and, in any event, is not entitled to a presumption of truth.  SAC, at ¶ 148.

Nor do the allegations describing how Facebook has publicly shared its *designs* assist in that regard.  See, e.g., id. at ¶ 85 ("Facebook claims to share its data center designs and information openly with the public . . . .").  Even if it is true as Plaintiffs allege that Facebook made a public disclosure in an effort to reduce its data center costs, and even assuming that sort of effort can satisfy the Lanham Act's "commercial transaction" requirement, there is no allegation that Facebook publicly shared any related *services* with that same motivation.[3]

Since the allegations of falsely-designated services do not support a "reverse passing off" theory, the only other allegations relevant to the claim are those stating that Facebook has falsely asserted the origin of the RDDC method.  But those allegations, which are focused on misrepresentation in connection with an idea or concept rather than on a good or service, are

---

[3] For this reason, Plaintiffs' comparison of their allegations to those examined by the Seventh Circuit in M. Arthur Gensler Jr. & Assocs. v. Strabala, 764 F.3d 735 (2014), is ineffective.  The limited facts discussed in the opinion indicate that the defendant, an architect, was actually offering services in connection with the alleged misrepresentation.

14
Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

equally insufficient under the holding of Dastar.

For these reasons, Plaintiffs have not stated a plausible claim for a violation of § 43(a) of the Lanham Act. Though the court doubts Plaintiffs can ever do so in light of the factual scenario described in the SAC, it will nonetheless dismiss the claim with leave to amend to allow them an opportunity to restate the claim if they believe they can. See Krainski v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ., 616 F.3d 963, 972 (9th Cir. 2010) ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.").

### C. Unfair Competition Law

The Unfair Competition Law ("UCL") prohibits business practices that are unlawful, unfair, or fraudulent. Cal. Bus. & Prof. Code § 17200. "Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services,'" and its language is framed broadly in service of that purpose. Kwikset v. Super. Ct., 51 Cal. 4th 310, 320 (2011) (quoting Kasky v. Nike, Inc., 27 Cal.4th 939, 949 (2002)).

Two of the UCL's three "prongs" are relevant to Plaintiffs' claim. The first is the "unlawful" prong, which "borrows violations of other laws and treats them as independently actionable." Daugherty v. Am. Honda Motor Co., Inc., 144 Cal. App. 4th 824, 837 (2006). "Virtually any law - federal, state or local - can serve as a predicate for an action" under the UCL's unlawful prong. Smith v. State Farm Mut. Ins. Co., 93 Cal. App. 4th 700, 718 (2001). The second is the "unfair" prong. California courts have struggled to define exactly what constitutes an "unfair" business practice, and often apply different tests depending on whether the action is involves consumers or competitors. Drum v. San Fernando Valley Bar Assn., 182 Cal. App. 4th 247, 253 (2010). But any standard that is applied must accomplish the UCL's inclusive purpose, which authorizes a cause of action to "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

Facebook moves to dismiss Plaintiffs' claim under the "unlawful" prong of the UCL

1  because it relies on the allegations underlying the CUTSA and Lanham Act claims, which it

2  argues also fail.  Because Plaintiffs' CUTSA claim survives this motion, so does its UCL claim to

3  the extent it is based on those same allegations.

4        As to the claim under the "unfair" prong, Facebook argues it is deficient because Plaintiffs

5  do not allege they are consumers or competitors of Facebook in the area of data center technology.

6  Though Facebook cites cases, including this court's prior dismissal order, that ostensibly support

7  such a limitation on who can bring claim for "unfair" practices, further review of the relevant

8  authority reveals that this type of categorical restriction is inappropriate given the UCL's

9  comprehensive purpose.  Notably, nothing in the UCL's text limits claims only to consumers or

10 competitors, though both types of plaintiffs can certainly qualify under its language.  See In re

11 Pomona Valley Med. Grp., 476 F.3d 665, 675 (9th Cir. 2007) ("As the California courts have

12 explained, the unfair competition statute is not limited to 'conduct that is unfair to competitors.'").

13 Instead, the UCL more broadly requires the plaintiff demonstrate a loss of money or property as a

14 result of unfair competition.  Kwikset, 51 Cal. 4th at 322.

15       Plaintiffs' claim under the "unfair" prong endures under this more liberal examination.

16 Plaintiffs list in the SAC several practices that are plausibly unfair, including allegations that

17 Facebook released information related to the BladeRoom technology through OpenCompute,

18 which they also allege damaged their licensing markets and emboldened their competitors.  The

19 court finds these allegations sufficiently describe how Plaintiffs lost money as a result of

20 Facebook's purportedly unfair business practices.  And though Facebook suggests otherwise, this

21 conduct describes much more than a breach of a contract.

22       In addition, the court rejects Facebook's argument that the UCL claim is preempted by

23 CUTSA.  This form of preemption applies to a claim "based on the same nucleus of facts as the

24 misappropriation of trade secrets claim for relief."  K.C. Multimedia, Inc. v. Bank of America

25 Tech. & Operations, Inc., 171 Cal. App. 4th 939, 954 (2009).  A claim is not preempted, however,

26 "if it is based upon alleged facts beyond trade secret misappropriation."  Titan Global LLC v.

Organo Gold Int'l, Inc., No.: 12-CV-2104-LHK, 2012 U.S. Dist. LEXIS 171484, at *30, 2012 WL 6019285 (N.D. Cal. Dec. 2, 2012). Here, Plaintiffs' UCL allegations - in particular those alleging Facebook's public disclosure of Plaintiffs' technology - go well beyond those that constitute the acts of trade secret misappropriation. Therefore, the UCL claim is not preempted by CUTSA.

### D.     Breach of Contract

Facebook moves to dismiss the breach of contract claim, at least as asserted by Bripco, because it was not a party to the non-disclosure agreement between BRG and Facebook. Though that is true, Bripco's breach of contract claim is not subject to dismissal for that reason because a "'contract made by an agent for an undisclosed principal is for most purposes the contract of the principal and it may sue . . . thereon,'" unless the principal is excluded by the terms of the agreement. Total Recall Techs. v. Luckey, 2016 U.S. Dist. LEXIS 5659, at *11, 2016 WL 199796 (N.D. Cal. Jan. 16, 2016) (quoting Tom Trading, Inc. v. Better Blue, Inc., 26 Fed. Appx. 733, 735 (9th Cir. 2002)).

Here, the terms of the non-disclosure agreement do not exclude Bripco. Furthermore, the fact that Bripco licensed its trade secrets to BRG, who in turn revealed that information to Facebook under the alleged protections of a non-disclosure agreement, at least implies that BRG was acting in the capacity as Bripco's agent during the transaction. See Pearson Educ., Inc. v. Alahmad, No. 2:12-cv-2936-KJM-CKD, 2013 U.S. Dist. LEXIS 53991, at *15, 2013 WL 1641533 (E.D. Cal. Apr. 16, 2013) (citing Parrish v. Nat'l Football League Players Ass'n, 534 F. Supp. 2d 1081, 1097 (N.D. Cal. 2007)). Because it is still plausibly pled, Facebook's second attempt to dismiss the breach of contract claim will be denied.

## IV.    ORDER

Based on the foregoing, Facebook's Motion to Dismiss (Dkt. No. 114) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to the third cause of action for violation of § 43(a) of the Lanham Act, which is DISMISSED WITH LEAVE TO AMEND. The motion is DENIED in all other aspects.

17

Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

To be clear, Plaintiffs are permitted leave to amend only the claim for violation of the Lanham Act, and any amended complaint must be filed on or before **February 28, 2017**. Plaintiffs may not add new claims or new parties solely by virtue of this order.

If no amended complaint is filed by February 28, 2017, Facebook shall file an Answer to the SAC on or before **March 15, 2017**.

**IT IS SO ORDERED.**

Dated: February 10, 2017

EDWARD J. DAVILA
United States District Judge