**COOLEY LLP**
MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)
MATTHEW D. CAPLAN (260388) (mcaplan@cooley.com)
KRISTINE A. FORDERER (278745) (kforderer@cooley.com)
101 California Street, 5th Floor
San Francisco, CA  94111-5800
Telephone:     (415) 693-2000
Facsimile:      (415) 693-2222

**COOLEY LLP**
HEIDI L. KEEFE (178960) (hkeefe@cooley.com)
MARK F. LAMBERT (197410) (mlambert@cooley.com)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:     (650) 843-5000
Facsimile:      (650) 849-7400

Attorneys for Defendant
FACEBOOK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BLADEROOM GROUP LIMITED, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., EMERSON ELECTRIC CO., EMERSON NETWORK POWER SOLUTIONS, INC. and LIEBERT CORPORATION,<br><br>Defendants. | Case No.  15-cv-01370 EJD<br><br>**EXHIBIT A:**<br><br>**JOINT ADMINISTRATIVE MOTION TO FILE UNDER SEAL THE ORDER GRANTING IN PART AND DENYING IN PART FACEBOOK'S MOTION FOR SUMMARY JUDGMENT (ECF. NO. 493)** |

**(REDACTED VERSION**

COURTESY/CHAMBERS COPY – DOCUMENTS
SUBMITTED UNDER SEAL
CASE NO.  15-CV-01370 -EJD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BLADEROOM GROUP LIMITED, et al., <br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., et al., <br> Defendants. | Case No.  5:15-cv-01370-EJD <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. No. 384 |

## I.    INTRODUCTION

This litigation over the alleged misappropriation of trade secrets involves a building located in a small city on the northern coast of Sweden and its connection to the largest social networking company in the world.

The small Swedish city is Luleå and the building, succinctly named "LLA2," is a type of warehouse-sized data center used to "house the vast arrays of computer servers that form the backbone of the internet and the high-technology economy."  Second Am. Compl., Dkt. No. 107, at ¶ 1.

The company is Defendant Facebook, Inc.  Plaintiffs BladeRoom Group Limited ("BRG") and Bripco (UK) Limited ("Bripco")[1] allege that Facebook along with Defendants Emerson Electric Co., Emerson Network Power Solutions, Inc. and Liebert Corporation[2] purportedly enticed BladeRoom to reveal its collection of innovative designs and methods for the construction

---

[1] When not named separately, BRG and Bripco are referred to collectively as "BladeRoom."

[2] These affiliated defendants are referred to collectively as "Emerson."

of a modular data center known as the "Armature" technology with promises of acquisition and partnership, only to then appropriate that technology and incorporate them into LLA2. BladeRoom now asserts claims for trade secret misappropriation, breach of contract, and violation of the Unfair Competition Law ("UCL"), California Business and Professions Code § 17200 et seq.

Federal jurisdiction arises pursuant to 28 U.S.C. §§ 1331 and 1332, and presently before the court is Facebook's Motion for Summary Judgment. Dkt. No. 384. Plaintiffs oppose. Since the record reveals several material disputes of fact, the majority of Facebook's motion will be denied for the reasons explained below.[3]

## II.    LEGAL STANDARD

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the issue is one on which the nonmoving party must bear the burden of proof at trial, the moving party need only point out an absence of evidence supporting the claim; it does not need to disprove its opponent's claim. Id. at 325.

If the moving party meets the initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324. A "genuine issue" for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her

---

[3] Because the general factual and procedural background is extensive and well-known to the parties, it is not repeated in detail but referenced where necessary to the summary judgment analysis.

Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

2

1    favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

2          The court must draw all reasonable inferences in favor of the party against whom summary

3    judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

4    However, the mere suggestion that facts are in controversy, as well as conclusory or speculative

5    testimony in affidavits and moving papers, is not sufficient to defeat summary judgment.  Id.

6    ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than

7    simply show that there is some metaphysical doubt as to the material facts.");  Thornhill Publ'g Co.

8    v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).  Instead, the non-moving party must come

9    forward with admissible evidence to satisfy the burden.  Fed. R. Civ. P. 56(c).

10          "If the nonmoving party fails to produce enough evidence to create a genuine issue of

11   material fact, the moving party wins the motion for summary judgment."  Nissan Fire & Marine

12   Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).  "But if the nonmoving party

13   produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats

14   the motion."  Id.

## III.    DISCUSSION

### A.    Misappropriation of Trade Secrets

#### i.    Governing Authority

18         In a broad sense, a trade secret "consists of any unpatented idea which may be used for

19   industrial and commercial purposes."  Altavion, Inc. v. Konica Minolta Sys. Lab., 226 Cal. App.

20   4th 26, 54 (2014) (quoting Sinclair v. Aquarius Elecs., Inc., 42 Cal. App. 3d 216, 222 (1974)).  In

21   turn, laws protecting trade secrets "allow[] the inventor to disclose an idea in confidential

22   commercial negotiations certain that the other side will not appropriate it without compensation."

23   Id. at 34.

24         The California Uniform Trade Secrets Act ("CUTSA"), codified at California Civil Code §

25   3426 et seq., is one such law.  CUTSA "creates a statutory cause of action for the

26   misappropriation of a trade secret."  Brescia v. Angelin, 172 Cal. App. 4th 133, 143 (2009).

27
Case No.: 5:15-cv-01370-EJD
28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

1    CUTSA defines a "trade secret" as "information, including a formula, pattern, compilation,

2    program, device, method, technique, or process, that: (1) Derives independent economic value,

3    actual or potential, from not being generally known to the public or to other persons who can

4    obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are

5    reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).

6    "Misappropriation" includes the "[a]cquisition of a trade secret of another by a person who knows

7    or has reason to know that the trade secret was acquired by improper means," as well as the

8    "[d]islcosure or use of a trade secret of another without express or implied consent" by a person

9    who acquired the trade secret through improper means.  Cal. Civ. Code § 3426.1(b); Silvaco Data

10    Sys. v. Intel Corp., 184 Cal. App. 4th 210, 222 (2010) ("Under CUTSA, misappropriation of a

11    trade secret may be achieved through three types of conduct: '[a]cquisition,' '[d]isclosure,' or

12    '[u]se.'").  "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of

13    a breach of a duty to maintain secrecy, or espionage through electronic or other means" but

14    excludes "[r]everse engineering or independent derivation alone."  Cal. Civ. Code § 3426.1(a).

15          To demonstrate a prima facie claim of misappropriation under CUTSA, a plaintiff must

16    prove: "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the

17    plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the

18    plaintiff."  Cytodyn, Inc. v. Amerimmune Pharms., Inc., 160 Cal. App. 4th 288, 297 (2008).

            ii.    **Application**

                a.  **Element 1: Identification of Trade Secrets**

21          Under CUTSA's ownership element, Facebook argues BladeRoom failed to identify three

22    categories of trade secrets: (1) each of the asserted combination trade secrets, (2) trade secrets

23    based on "know-how," and (3) trade secrets comprised of ████████████

24          As a matter of logic, a CUTSA plaintiff must identify its trade secrets before a

25    misappropriation analysis can be undertaken.  See Altavion, 226 Cal. App. 4th at 43.  Indeed,

26    CUTSA itself requires such identification.  See Cal. Civ. Proc. Code § 2019.210.  The plaintiff

Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

United States District Court
Northern District of California

must "'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" Imax Corp. v. Cinema Techs., Inc., 152 F.3d 1161, 1164-65 (9th Cir. 1998) (quoting Universal Analytics v. MacNeal-Schwendler Corp., 707 F. Supp. 1170, 1177 (C.D. Cal. 1989)) ("Imax").

Just what constitutes a sufficient showing of particularity under § 2019.210 is not statutorily defined; instead, § 2019.210 is purposely vague to permit "play in the joints." Advanced Modular Sputtering, Inc. v. Super. Ct., 132 Cal. App. 4th 826, 835 (2005). That said, there are some guidelines. The party alleging misappropriation need not "define every minute detail of its claimed trade secret at the outset of the litigation," but "must make some showing that is reasonable, i.e., fair, proper, just and rational[,] under all of the circumstances." Id. at 835-36. "The degree of 'particularity' that is 'reasonable' will differ, depending on the alleged trade secrets at issue in each case." Id. at 836.

The court examines Facebook's arguments and BladeRoom's disclosures with this authority in mind.

### 1. The Combination Trade Secrets

On August 7, 2017, BladeRoom disclosed 13 combination trade secrets, each of which consists of some permutation of its 25 separately-asserted trade secrets. Relying on Imax, Facebook faults this disclosure and the other related materials for omitting "any explanation of the significance or novelty of these combinations, or how the parts work together to create a trade secret." The court has previously addressed and rejected a similar argument made against the combination trade secrets. Dkt. No. 345. Its reappearance at summary judgment is no more persuasive.

To begin, it is important to outline the boundaries of Facebook's argument. The motion reveals a challenge limited to disclosures and responses made during this litigation, and questions whether the disclosures and responses revealed the combination trade secrets with sufficient

United States District Court
Northern District of California

1  particularity under § 2019.210 and Imax. Facebook does not argue that BladeRoom's individual

2  trade secrets when not placed in combination fail to qualify for separate trade secret protection

3  because they were, for example, publicly disclosed.

4  Furthermore, the court understands that Facebook is not requesting review or

5  reconsideration of discovery disputes concerning BladeRoom's pretrial disclosures of individual

6  trade secrets. The sufficiency of BladeRoom's disclosures was an issue litigated and decided on

7  referral to Magistrate Judge Howard R. Lloyd, who ultimately determined on May 22, 2017, that

8  BladeRoom's discovery disclosures sufficiently detailed its claimed trade secrets in order to

9  proceed on its theory of misappropriation. Dkt. Nos. 290, 293. Judge Lloyd's ruling was issued

10  without objection, and the time to object has long-since expired. Fed. R. Civ. P. 72(a) (providing

11  that objections to the nondispositive pretrial order of a magistrate judge must be filed within 14

12  days after service of the order). The ruling therefore remains undisturbed for the purpose of this

13  motion.

14  In addition, it must be clarified that despite Facebook's references to the concept in

15  argument, "[n]ovelty, in the patent law sense, is not required for a trade secret." Kewanee Oil Co.

16  v. Bicron Corp., 416 U.S. 470, 476 (1974). Instead, "secrecy, in the context of trade secrets, thus

17  implies at least minimal novelty." Id. That said, BladeRoom's disclosures of combination trade

18  secrets are not tested under the same novelty rubric applied in patent infringement cases. To the

19  extent Facebook seeks that level of specificity as to the novelty of any trade secret, the court will

20  not oblige.

21  When properly framed to exclude the arguments listed above, Facebook's persistent

22  suggestion that BladeRoom altogether failed to disclose the significance of its combination trade

23  secrets is an ineffectual overstatement that does not account for either the record or the nature of

24  the combination trade secrets. The simplicity of BladeRoom's August 7th disclosure

25  notwithstanding, Facebook cannot dispute that the combination trade secrets are exclusively

26  comprised of the same separately-asserted individual trade secrets that Judge Lloyd found were

United States District Court
Northern District of California

adequately disclosed. Nor can it reasonably dispute that BladeRoom's individual trade secrets each claim certain construction aspects which can be combined using a distinct methodology to form a modular data center. Indeed, Trade Secret 1 explicitly describes exactly that concept. Trade Secret 1 recites ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████ Thus, contrary to Facebook's position on the issue, the record prior to August 7th contained information which could and can now be utilized to explain both the combinations and how the combinations' individual parts work together to form a trade secret.

These circumstances are - again - fatal to any argument asserting lack of particularity. The failure to object to Judge Lloyd's ruling on the sufficiency of BladeRoom's disclosures must foreclose any attempt at this point to question whether the individual components of the combination trade secrets have been adequately disclosed in this litigation, with the exception of one that will be discussed under a subsequent heading. See InfoSpan, Inc. v. Emirates NBD Bank PJSC, No. SACV JVS (ANx), 2015 WL 13357646, at *2 (C.D. Cal. May 6, 2015). In turn, Facebook cannot credibly disclaim an understanding of those same trade secrets, or how those trade secrets can work together, just because they are placed into a combination. See Altavion, 226 Cal. App. 4th at 48-49 (rejecting defendant's argument that combination trade secret was not adequately disclosed before trial). Again, the end-product and the individual parts have always been a part of this litigation.

Imax does not assist Facebook with this argument despite the attempt at analogy. In Imax, the plaintiff asserted misappropriation of trade secrets related to large format motion picture projectors. During discovery, the plaintiff claimed the design of the camera unit as a trade secret, "including every dimension and tolerance that defines or reflects that design." 152 F.3d at 1166. The district court granted summary judgment to the defendant after determining the plaintiff failed

Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

7

United States District Court
Northern District of California

1 to identify its trade secret with sufficient particularity. In reaching that decision, the district court

2 found the general design of the camera had been publicly disclosed and the plaintiff did not further

3 identify exactly what dimensions and tolerances it claimed as trade secrets. The plaintiff appealed.

4   The Ninth Circuit affirmed, agreeing with the district court that the plaintiff failed to

5 adequately identify its trade secrets. The court reasoned that the plaintiff's reference to "every

6 dimension and tolerance" in its disclosures lacked specificity because it did not "*clearly refer* to

7 tangible trade secret material." Id. at 1167 (emphasis in original). Furthermore, the court

8 observed that the defendant could not be expected to prepare a response to the plaintiff's claim of

9 trade secret misappropriation without some concrete definition of exactly which "dimensions and

10 tolerances" were present in the defendant's product. Id.

11   The combination trade secrets are entirely distinguishable from the disclosure at issue in

12 Imax. There, the absence of any specific dimension or tolerance left it unknown exactly what was

13 being claimed as a trade secret separately from the public disclosures, and it made a defense to the

14 misappropriation claim functionally impossible. Here, in plain contrast, the combination trade

15 secrets consist of nothing more than arrangements of BladeRoom's other trade secrets, which a

16 magistrate judge determined were adequately disclosed. Thus, unlike the defendant in Imax,

17 Facebook has received a concrete identification of what is being asserted through the combination

18 trade secrets.

19   In sum, the court finds the combination trade secrets were described with sufficient

20 particularity under § 2019.210 and Imax. Facebook's argument to the contrary is rejected.

### 2. The Know-How Trade Secrets

22   Also relying on Imax, Facebook argues some of BladeRoom's trade secrets based on

23 "know-how" - Trade Secrets 10, 15, 17, 18 and 19 - do not sufficiently describe the purported

24 "know-how." As Facebook puts it, BladeRoom's "trade secrets repeatedly use the phrase 'know-

25 how' but never say what that know-how is."

26   This argument fares no better than the previous one. As a threshold matter, it directly

*United States District Court*
*Northern District of California*

confronts Judge Lloyd's May 22nd ruling affirming the sufficiency of BladeRoom's disclosures. Unlike the combination trade secrets which were not yet disclosed and not before Judge Lloyd during the parties' extensive discovery litigation, the "know-how" trade secrets were at issue. Judge Lloyd found under the circumstances of this case that the "know-how" trade secrets were sufficiently articulated, in a manner consistent with relevant case law. See, e.g., Advanced Modular Sputtering, Inc., 132 Cal. App. 4th at 836 (2005). The court will not revisit Judge Lloyd's ruling in this context, and this argument consequently fails on that basis alone. See InfoSpan, Inc., 2015 WL 13357646, at *2.

But even putting discovery rulings aside, the challenge is no more persuasive on its merits. The court recognizes that "[a] trade secret can relate to technical matters such as the composition or design of a product, a method of manufacture, or the *know-how necessary to perform a particular operation or service*." Restatement (Third) of Unfair Competition § 39 cmt. d (1995) (emphasis added). "Know-how" is "the informational and experiential expertise related to practical application of specifics, such as patented or unpatented inventions, formulas or processes." 1-1 Milgrim on Trade Secrets § 1.09 (2017). In order to separate protectable "know-how" from general knowledge and skill, "know-how" trade secrets must be described with "a reasonable degree of precision and specificity." Id.; accord SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1261-62 (3d Cir. 1985).

BladeRoom's disclosures of its claimed "know-how" trade secrets satisfy this framework. Though the details are not described here so as to avoid a need to redact extensive portions of confidential information, the court finds that Bladeroom's discovery responses, when read along with its § 2019.210 disclosure, precisely and specifically describe what it claims as the know-how necessary to perform the operations contemplated by Trade Secrets 10, 15, 17, 18 and 19. Decl. of Jeffrey M. Fisher, Dkt. No. 373, at Ex. 6. These same discovery responses also demonstrate that what BladeRoom claims as "know-how" in the five trade secrets presently at issue is much more than the general knowledge and skill needed to construct a data center. The documents in the

United States District Court
Northern District of California

1    record, therefore, undermine Facebook's objection to the "know-how" trade secrets based on

2    Imax, and summary judgment is inappropriate on that basis.

### 3. Trade Secret 9.2

4    Trade Secret 9.2 is a subset of Trade Secret 9, which generally claims the design of

5    software for use in an atmospheric control system. Trade Secret 9.2 describes an attribute of the

6    software which includes ███████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████" Facebook argues that

9    the disclosure of Trade Secret 9.2 lacks requisite particularity under Imax. On this issue, the court

10   agrees for two reasons.

11   First, BladeRoom failed to provide any response to this portion of Facebook's motion.

12   Because it is not the court's duty to create arguments or find evidence for the non-moving party on

13   summary judgment, BladeRoom has implicitly conceded the issue. See Keenan v. Allan, 91 F.3d

14   1275, 1279 (9th Cir. 1996); see also Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1030-31

15   (2001).

16   Second, it is apparent the disclosure of Trade Secret 9.2 could not be sustained in any

17   event. Facebook correctly points out that neither the "████████" nor the "████████"

18   referenced in Trade Secret 9.2 are further defined in BladeRoom's § 2019.210 disclosure, and

19   BladeRoom did not designate which portions of the record demonstrate it provided any subsequent

20   definition. Thus, similar to the phrase "including every dimension and tolerance" which the Imax

21   court found problematic, the terms "████████" and "████████████" as used in Trade

22   Secre 9.2 are so inexact that it is impossible to determine what is claimed as a trade secret. Only

23   BladeRoom knows what it means with those terms, but without more support they are too vague to

24   stand on. See Imax, 152 F.3d at 1167 ("Under these facts, reasonable specificity could only be

25   achieved by identifying the precise numerical dimensions and tolerances as trade secrets.")

26   Accordingly, the court finds that Trade Secret 9.2 has not been defined with sufficient

27   Case No.: 5:15-cv-01370-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
28   SUMMARY JUDGMENT

United States District Court
Northern District of California

particularity. Facebook's motion will be granted as to that trade secret, and to any combination trade secret incorporating Trade Secret 9. This is so because BladeRoom has framed Trade Secret 9.2 as an essential attribute of the software claimed in Trade Secret 9. Since its disclosure was inadequate, neither Facebook nor a reasonable jury can discern the boundaries of Trade Secret 9 or any of the combination trade secrets that rely on it.

### b. Element 2: Acquisition, Disclosure, or Use of Trade Secrets

#### 1. Acquisition

Under CUTSA, acquisition of a trade secret by improper means constitutes an appropriation distinct from subsequent use or disclosure. See Silvaco Data Sys., 184 Cal. App. 4th at 222. Facebook argues BladeRoom cannot prove misappropriation of its trade secrets by improper acquisition. In light of the standard that applies to this motion, the court finds otherwise.

As an initial matter, BladeRoom's contention that summary judgment must be denied to Facebook solely because it failed to separately address each specific instance of alleged misappropriation is inaccurate and invites misapplication of the parties' burdens. "When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) (quoting Celotex Corp., 477 U.S. at 325). Here, Facebook argued in its summary judgment motion that BladeRoom has no evidence of improper acquisition or disclosure. Since BladeRoom would need to prove misappropriation at trial, Facebook's argument is enough to shift the burden of production to BladeRoom. The case relied on by BladeRoom to argue differently, Brocade Communications Systems, Inc. v. A10 Networks, Inc., 873 F. Supp. 2d 1192 (N.D. Cal. 2012), is inapposite because, unlike Facebook, the moving defendant altogether failed to move for summary judgment on misappropriation by acquisition or disclosure.

That said, the question is whether BladeRoom produced sufficient evidence on which a reasonable jury could find that Facebook improperly acquired its trade secrets. CUTSA does not

United States District Court
Northern District of California

define what it means by improper acquisition, but "leaves [its] delineation to be adjudicated in light of the purposes and other provisions of the act." Silvaco, 184 Cal. App. 4th at 222; accord Restatement (Third) of Unfair Competition § 43 cmt. c (1995) ("It is not possible to formulate a comprehensive list of the conduct that constitutes 'improper' means of acquiring a trade secret. If a secret is acquired through conduct that is itself a tortious or criminal invasion of the trade secret owner's rights, the acquisition ordinarily will be regarded as improper."). However, CUTSA does specify in its definition of "improper means" that a trade secret can be misappropriated through misrepresentation. Cal. Civ. Code § 3426.1(b). Moreover, much like common law fraud,[4] improper acquisition can be proven with direct or circumstantial evidence. UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co., 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007).

BladeRoom's theory is that Facebook, along with Emerson, acquired its trade secrets by misrepresenting its motivation for engaging it in discussions concerning the Armature technology, which discussions ultimately resulted in ██████████████████████████████████████ ██████ BladeRoom cites to certain items of circumstantial evidence in support of this theory. ███████████████████████████████████████████████████ ██████████████████████████████████████████ Fisher Decl., Dkt. No. 373, at Ex. 10, 222:20-224:22; Ex. 13. ██████████████ ███████████████████████████████████████████ ████████████████████████████████████ Id. at Ex. 45, 97:5-20; Ex. 14. ████████████████████████████ ███████████████████████████████████████████████ Id. at Ex. 16.

██████████████████████████████████████

[4] "It is generally held that fraud may be established by circumstantial evidence." Dyke v. Zaiser, 80 Cal. App. 2d 639, 654 (1947).

Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California



Id. at Ex. 20.

Mar Decl., Dkt. No. 408, at Ex. 63, 251:2-25.

Id.

Fourth, a slide presentation entitled                    and dated "June 1-2" was attached to an email and                    on August 20, 2012. Id. at Ex. 86.

Id. at 100, 149:19-150:21.

Id. at 150:23-151.

Id.

United States District Court
Northern District of California



United States District Court
Northern District of California

1

2  <u>Id</u>.

3

4

5

6

7

8

9

10  <u>Id</u>.

11  Seventh, an email exchange between Emerson's Gerhart and BladeRoom's Paul Rogers

12  starting on May 17, 2012, reveals that Gerhart "look[ed] forward to meeting up and discussing a

13  potential business relationship" with BladeRoom, and eventually suggested a meeting in the

14  United Kingdom the week of June 18, 2012 -

15  <u>Id</u>. at Ex. 4.

16

17  . <u>Id</u>. at Ex.

18  39, 116:11-22; Ex. 5.

19

20  <u>Id</u>. at 45, 191:20-23.

21

22  <u>Id</u>. at 11, 83:8-84:5; Ex. 29.

23  Viewing this collection of evidence in the light most favorable to BladeRoom, a reasonable

24  jury could find that Facebook improperly acquired BladeRoom's trade secrets through

25  misrepresentation. The jury could infer from the record as a whole that

26

27

28  ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

14

United States District Court
Northern District of California

1  ██████████████████████████████████████████████████████████

2  ████████████████████████████████████ The jury could also permissibly infer

3  that Facebook ████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ██████████████████████████████████████████████████

6  Furthermore, the jury could infer that Facebook ████████████████████████████

7  ████████████████████████████████████████████████

8  ██████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████████

10 ████████████████████████████████████

11       In sum, BladeRoom has produced enough evidence to create a genuine issue of material

12 fact as to whether Facebook improperly acquired its trade secrets through misrepresentation, and

13 therefore defeats Facebook's motion arguing otherwise.

14                              **2. Disclosure**

15       Facebook argues BladeRoom has no evidence that Facebook improperly disclosed its trade

16 secrets. Not so.

17       CUTSA may be violated if a person knew or had reason to know at the time of a trade

18 secrets disclosure that his or her knowledge of the trade secret was "[a]cquired under

19 circumstances giving rise to a duty to maintain its secrecy or limit its use." Cal. Civ. Code §

20 3426.1(b)(2)(B)(ii). A duty of confidence with respect to trade secrets can be created by an

21 express promise, oftentimes embodied in an agreement governing the boundaries of disclosure and

22 use. Restatement (Third) of Unfair Competition § 41 cmt. b (1995); Convolve, Inc. v. Compaq

23 Comput. Corp., 527 Fed. App'x 910, 925 (Fed. Cir. 2013) (observing that under CUTSA,

24 circumstances giving rise to a duty to maintain the secrecy of trade secrets are dictated by the

25 terms of a non-disclosure agreement).

26       Unauthorized disclosure of a trade secret "ordinarily occurs as part of an attempt to exploit

27

28

the commercial value of the secret through use in competition with the trade secret owner or through sale of the information to other potential owners." Restatement (Third) of Unfair Competition § 40 cmt. c (1995). "If the owner of a trade secret discloses information for a limited purpose that is known to the recipient at the time of the disclosure, the recipient is ordinarily bound by the limitation unless the recipient has indicated an unwillingness to accept the disclosure on such terms." Restatement (Third) of Unfair Competition § 41 cmt. b (1995). And like misappropriation by acquisition, improper disclosure can be established by circumstantial evidence. See UniRAM Tech., Inc., 617 F. Supp. 2d at 944.

Here, the existence of a non-disclosure agreement between BladeRoom and Facebook defining the parties' confidentiality obligations with respect to disclosed trade secrets is undisputed. Fisher Decl., at Ex. 3.



Id.



Id.

Id.

BladeRoom contends that Facebook misappropriated its trade secrets by disclosing information to Emerson, and there is evidence in the record to support that contention.

Id. at Ex. 23.

Id. at Ex. 23. Id.

Id. at Ex. 26. Id.

. Id. at Ex. 72, 183:21-184:3.

Id. at Ex. 56.

United States District Court
Northern District of California



1
2
3
4
Id.
5
6
7
8
9
10
11
12
Id.
13
14
15
16
Id. at 27.
17
18
Id. at Ex. 31.
19
20
21
" Id. at Ex.
22
45, 255:23-256:4.
23
Id.
24
at 45, 267:19-22.
25
26
27
28

United States District Court
Northern District of California

United States District Court
Northern District of California



1    ████████████ <u>Id</u>. at Ex. 32. ████████████████████████████████████████

2    ████████████████████████████████████████████████████████████████████

3    ████████████ <u>Id</u>.

4         Fifth, a presentation entitled "████████████████████" and dated August 1, 2012,

5    includes a slide ████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████ <u>Id</u>. at Ex.

8    63.  The Emerson presentation is attributed to Wilcox, who notably did not attend the June, 2012,

9    meeting with BladeRoom.

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████ <u>Id</u>. at Ex. 74, 121:21-23. ████████████████████████████

13   ████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████" <u>Id</u>.

15   at Ex. 52. ████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████" <u>Id</u>. ████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████ <u>Id</u>.

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████ <u>Id</u>. at Ex.

23   34. ████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████ <u>Id</u>. at Ex. 43, 89:5-

26   9.

27

28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
     SUMMARY JUDGMENT

1

2

3

4 " Id.

5 Id. at Ex. 45, 376:10-

6 16.

7

8

9

10

11

12 Id. at Ex. 35.

13

14 Id. at Ex. 74, 134:12-25.

15

16 Id. at Ex. 60.

17 Id.

18

19 Id. at Ex. 74, 144:19-

20 25.

21      Eleventh, Facebook conducted a meeting from October 12th to October 17, 2012, it

22 fashioned the "Rapid Deployment Data Center Hack." Id. at Ex. 75. According to the agenda,

23 representatives from Facebook, AlfaTech, GKK Partners, NBBJ, PASE and Sheehan Partners

24 attended. Id.

25

26

27 Case No.: 5:15-cv-01370-EJD

28 ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

United States District Court
Northern District of California

████████████████████████████████████████████████

████ Id. at Ex. 41, 449:15-23. ████████████████████

████████████████████████████████████████████████

████████████████████ Id. at Ex. 36. ██████████████████

████████████████████████████████████████████

████████████ Id. at Ex. 39, 124:18-125:8.

A reasonable jury could find based on the evidence recited above that Facebook violated CUTSA by disclosing BladeRoom's trade secrets in a manner exceeding the duty of confidence defined by the non-disclosure agreement. Though the evidence is mostly referential and circumstantial, it nonetheless exists in sufficient amount for a jury to infer, when viewing it in the light most favorable to BladeRoom, that Facebook actually discussed BladeRoom's trade secrets with third parties on several occasions despite its express contractual obligation not to do so. Indeed, the jury could infer that ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

BladeRoom has satisfied its burden to show the existence of a triable fact as to whether Facebook improperly disclosed its trade secrets in violation of CUTSA. Facebook is not entitled to summary judgment on misappropriation by disclosure.

### 3. Use

Focusing now on misappropriation by use, Facebook argues there is no dispute of material fact that LLA2 does not "use" Trade Secrets 1, 2, 3, 5, 6, 8, 9, 11 and 25.2. In support, Facebook undertakes a variation of the analysis normally reserved for patent infringement cases: it defines claimed features of the trade secrets' components and then compares these components to the accused product - which for this case is LLA2 - ultimately concluding that none of the trade

United States District Court
Northern District of California

1    secrets were "used" in the construction of the data center.  Facebook's position appears to be that

2    unless BladeRoom can show that LLA2 exhibits particular aspects of its trade secrets when

3    viewed through a limitation-for-element analysis, the court must grant summary judgment to

4    Facebook.

5         For its part, BladeRoom argues Facebook's quasi-infringement analysis is too restrictive

6    and cannot sustain its burden to show an absence of material fact for claims of trade secret

7    misappropriation through use.  BladeRoom is correct.

8         In patent law, the manner in which a plaintiff shows "use" of its patented invention is well-

9    defined and mechanical: the plaintiff must demonstrate the presence of every claim limitation or

10   its equivalent in the accused device.  Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1301

11   (Fed. Cir. 2011); WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1346 (Fed. Cir. 1999)

12   (holding that patent infringement involves a "two-step analysis," where the court first construes

13   the claims at issue and then determines "whether the claims, as properly construed, read on the

14   accused device").  But "use" is not such an inflexible term when it comes to trade secret

15   misappropriation.  "[U]nauthorized use need not extend to every aspect or feature of the trade

16   secret; use of any substantial portion of the secret is sufficient to subject the actor to liability."

17   Restatement (Third) of Unfair Competition § 40 cmt. c (1995).  Furthermore, "the actor need not

18   use the trade secret in its original form."  Id.  Instead, "an actor is liable for using the trade secret

19   with independently created improvements or modifications if the result is substantially derived

20   from the trade secret."  Id.; accord Mangren Res. & Dev. Corp. v. Nat'l Chem. Co., Inc., 87 F.3d

21   937, 944 (7th Cir. 1996) ("[I]f trade secret law were not flexible enough to encompass modified or

22   even new products that are substantially derived from the trade secret of another, the protections

23   that law provides would be hollow indeed.").

24        The broad definition of "use" applicable to trade secret claims means that the method of

25   defending against patent infringement by comparing claim limitations to elements, and showing

26   that one does not read on the other, is unsuited to showing the absence of a triable fact of trade

27   Case No.: 5:15-cv-01370-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
28   SUMMARY JUDGMENT

United States District Court
Northern District of California

secret misappropriation.  See SkinMedica, Inc. v. Histogen, Inc., 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012) (noting that patent limitations are not imported to trade secret claims) ("SkinMedica"). Rather, trade secret misappropriation through use can occur under CUTSA in a wide variety of ways, including "[e]mploying the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information."  PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1383 (2000).

The difference stems from the distinct protections afforded by patent law and trade secret law.  Whereas a patent protects a publicly-disclosed idea from appropriation by others, "[t]rade secret law . . . protects only *the right to control the dissemination of information*."  Silvaco, 184 Cal. App. 4th at 220-21 (emphasis in original); accord DVD Copy Control Ass'n, Inc. v. Bunner, 31 Cal. 4th 864, 880 (2003) (observing the property right created by trade secret law is defined by the extent to which the owner of the secret protects his interest from disclosure to others).  In contrast to the visible ways a publicly-disclosed, patented idea can be incorporated into a product or technology and assessed for its presence or absence, the unlawful dissemination of an otherwise private idea can manifest in various, non-direct ways that nonetheless evidence the use of undisclosed information.

The distinction was illustrated in SkinMedica.  There, both the plaintiff and defendant were companies that developed and sold skincare products.  The plaintiff sued the defendant for patent infringement and misappropriation of trade secrets after it learned the defendant planned to launch a line of products resembling one of its own.  The district court granted summary judgment of non-infringement to the defendant on the patent claims.  In a subsequent summary judgment motion directed at the trade secret misappropriation claims, the defendant argued misappropriation could not be found because its products did not use "several of the claimed elements" from the plaintiff's trade secrets.

Addressing the defendant's argument, the district court found it "misunderstands the law on this point."  869 F. Supp. 2d at 1197.  The court reasoned that "[i]n the context of trade secret

1    misappropriation, information may be improperly 'used' in that it is unlawfully acquired and then

2    built upon or modified before being disclosed or benefit derived." Id. And the court ultimately

3    held that the defendant's "scattershot attempt to disclaim use of various elements of the claimed

4    trade secrets does not foreclose the possibility that [the defendant's] process was not substantially

5    derived from the claimed trade secrets, even if it differed in specifics from the process described

6    therein." Id.

7         Here, Facebook has attempted a comparable "scattershot attempt" to disclaim the use of

8    BladeRoom's trade secrets in the construction of LLA2. Though this is not a patent infringement

9    case, Facebook repeatedly argues that its design did not incorporate the "limitations" or

10   "elements" of BladeRoom's trade secrets. But for the reasons explained, there is no reason to

11   engage such a strict comparison. As SkinMedica teaches, that type of defense does not exclude

12   the possibility that a reasonable jury could still find that LLA2 was substantially derived from

13   BladeRoom's trade secrets.

14        And viewing the evidence in the light most favorable to BladeRoom, a reasonable jury

15   could so find. First, the jury could infer that Facebook's implemented data center design shifted to

16   a model closely resembling BladeRoom's modular technology after Facebook acquired

17   BladeRoom's trade secrets. The record shows that prior to Facebook's engagement with

18   BladeRoom, ███████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ███████████ Mar Decl., at Ex. 118; Defs.' J.A, Dkt. No. 385, at Ex. H. ███████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ██████████████████████████ Defs.' J.A., at Ex. A. ██████████████

24   ████████████████████████████████████████████████ Id.

25   ████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████

27

28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
     SUMMARY JUDGMENT

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮ <u>Id</u>. at Exs. A, C. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮ Mar Decl., at Ex. 58, 106:9-107:8.

4      Second, a reasonable jury could find several marked similarities between LLA2 and

5 BladeRoom's trade secrets. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defs.' J.A. at Ex. C.

12      Accordingly, the evidentiary record discloses a triable issue of fact as to whether Facebook

13 violated CUTSA by improperly using BladeRoom's trade secrets.  Facebook's motion for

14 summary judgment will therefore be denied on this aspect of BladeRoom's trade secret

15 misappropriation claim.

16     **B.**    **Breach of Contract**

17      Facebook argues that BladeRoom cannot pursue a claim for breach of the non-disclosure

18 agreement because BladeRoom breached it before Facebook allegedly did.  More specifically,

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮ Facebook also argues BladeRoom cannot adduce evidence to show that it

22 breached the non-disclosure agreement.  Neither argument is persuasive.

23      In California, "[t]he standard elements of a claim for breach of contract are '(1) the

24 contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4)

25 damage to plaintiff therefrom.'"  <u>Wall St. Network, Ltd. v. New York Times Co.</u>, 164 Cal. App.

26 4th 1171, 1178 (2008) (quoting <u>Regan Roofing Co. v. Super. Ct.</u>, 24 Cal. App. 4th 425, 434-35

1    (1994)).

2         The second element is based on the "bedrock principle of California contract law" that

3    "'[h]e who seeks to enforce a contract must show that he has complied with the conditions and

4    agreements of the contract on his part to be performed.'" Brown v. Dillard's, Inc., 430 F.3d 1004,

5    1006 (9th Cir. 2005) (quoting Pry Corp. of Am. v. Leach, 177 Cal. App. 2d 632, 639 (1960)).

6    Facebook's first argument seeks to broadly enforce that principle, such that "any breach of the

7    terms of a contract by a party deprives him of the right to maintain an action against the other

8    party to enforce the obligation of the latter." Redpath v. Evening Express Co., 4 Cal. App. 361,

9    367 (1906). "But this is not the law, nor has it ever been, either at law or in equity." Id. Instead,

10   "no obligation of a contract is to be regarded as a condition precedent unless made so by express

11   terms or necessary implication." Verider v. Verdier, 133 Cal. App. 2d 325, 334 (1955). "Where a

12   breach is partial and is 'capable of being fully compensated', the strong tendency is to regard it as

13   insufficient to constitute a defense." Id.

14        Here, Facebook has not cited any provision of the non-disclosure agreement rendering its

15   confidentiality obligations contingent on those of BladeRoom, such that a breach by BladeRoom

16   excuses Facebook from performing. Without such an express provision, the only rational

17   interpretation of the agreement is that the parties' obligations are mutual but also separable and

18   independent; that is, a defaulting party may still sue for breach of the agreement if its confidential

19   information is improperly released subsequent to its own breach. See Larson v. Thoresen, 116

20   Cal. App. 2d 790, 794 (1953) (observing that "the provisions of a contract will not be construed as

21   conditions precedent in the absence of language plainly requiring such construction"). Construing

22   a mutual non-disclosure agreement like this one in the way Facebook advocates would permit tit-

23   for-tat or retaliatory disclosures of trade secrets that no reasonable company holding valuable

24   confidential information would expect or tolerate, and would certainly be an absurd result from a

25   business perspective. See Powerine Oil Co., Inc. v. Super. Ct., 37 Cal. 4th 377, 390 (2005) ("The

26   fundamental goal of contractual interpretation is to give effect to the mutual intention of the

27   Case No.: 5:15-cv-01370-EJD

28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

1    parties."); see also Mount Vernon Fire Ins. Corp. v. Oxnard Hosp. Enter., Inc., 219 Cal. App. 4th

2    876, 882 (2013) (recognizing that courts interpreting a contract "seek a commonsense

3    interpretation which avoids absurd results").

4         In addition, Facebook's second argument is no longer sustainable in light of the evidence

5    of disclosure and use recited in connection with the trade secret misappropriation claim. A

6    reasonable jury could conclude based on that same evidence that Facebook breached the non-

7    disclosure agreement.

8         The motion for summary judgment will be denied as to the breach of contract claim.

9    **C.    UCL**

10        The UCL prohibits business practices that are unlawful, unfair, or fraudulent. Cal. Bus. &

11   Prof. Code § 17200. "Its purpose 'is to protect both consumers and competitors by promoting fair

12   competition in commercial markets for goods and services,'" and its language is framed broadly in

13   service of that purpose. Kwikset v. Super. Ct., 51 Cal. 4th 310, 320 (2011) (quoting Kasky v.

14   Nike, Inc., 27 Cal.4th 939, 949 (2002)). Injunctive relief and restitution are possible remedies for

15   UCL violations. See Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1146 (2003).

16        Two of the UCL's three "prongs" are relevant to Plaintiffs' claim and to Facebook's

17   arguments on summary judgment. The first is the "unlawful" prong, which "borrows violations of

18   other laws and treats them as independently actionable." Daugherty v. Am. Honda Motor Co.,

19   Inc., 144 Cal.App.4th 824, 837 (2006). "Virtually any law - federal, state or local - can serve as a

20   predicate for an action" under the UCL's unlawful prong. Smith v. State Farm Mut. Ins. Co., 93

21   Cal. App. 4th 700, 718 (2001). The second is the "unfair" prong. California courts have struggled

22   to define exactly what constitutes an "unfair" business practice, and often apply different tests

23   depending on whether the action involves consumers or competitors. Drum v. San Fernando

24   Valley Bar Assn., 182 Cal. App. 4th 247, 253 (2010). But any standard that is applied must

25   accomplish the UCL's inclusive purpose, which authorizes a cause of action to "a person who has

26   suffered injury in fact and has lost money or property as a result of the unfair competition." Cal.

27

28   Case No.: 5:15-cv-01370-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
     SUMMARY JUDGMENT

United States District Court
Northern District of California

Bus. & Prof. Code § 17204.

Facebook argues for summary judgment on the "unlawful" prong of the UCL claim because it is "tethered" to the CUTSA and breach of contract claims, and therefore stands or falls along with them. Because those claims will survive this motion, so too does the UCL claim based on "unlawful" conduct.

Facebook also argues for summary judgment on the "unfair" prong by characterizing the claim as based entirely on the disclosure of BladeRoom's methodology via the Open Compute program and on a blog post. But as BladeRoom clarifies in its opposition, its claim actually stems from Facebook's alleged portrayal of the BladeRoom technology as created by Facebook. That theory satisfies the UCL's broad purpose, and there is sufficient evidence in the record for a reasonable jury to find in favor of BladeRoom on that issue.

Finally, Facebook argues BladeRoom cannot receive restitution as a UCL remedy. The court must agree. BladeRoom has not submitted any evidence of money it paid to Facebook that could be ordered returned as restitution. See Korea Supply Co., 29 Cal.4th at 1144-44 (observing that a restitution order under the UCL is one "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person"). Thus, there is a failure of proof on that form of UCL damages.

Facebook is entitled to summary judgment on the UCL claim only to the extent it seeks restitution.

### D. Lost Profits

Lost profits may be recoverable as damages for breach of a contract. Sargon Enters, Inc. v. Univ. of S. Cal., 55 Cal. 4th 747, 773 (2012). They can also be recovered as a remedy for misappropriation of trade secrets. See Cal. Civ. Code § 3426.3(a) ("A complainant may recover damages for the actual loss caused by misappropriation."); see also Tri-Tron Intern. v. Velto, 525 F.2d 432, 437 (9th Cir. 1975). Under either theory, the plaintiff must prove causation. See Cal.

Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1   Civ. Code § 3300 ("For the breach of an obligation arising from contract, the measure of damages

2   . . . is the amount which will compensate the party aggrieved for all the detriment proximately

3   caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.");

4   see also Tri-Ton Intern., 525 F.2d at 437.  And like any other form of damages, lost profits "may

5   not be based upon sheer speculation or surmise, and the mere possibility or even probability that

6   damage will result from wrongful conduct does not render it actionable."  Ferguson v. Lieff,

7   Cabaser, Heimann & Bernstein, LLP, 30 Cal. 4th 1037, 1048 (2003) (quoting In re Easterbrook,

8   200 Cal. App. 3d 1541, 1544 (1988)).

9        Facebook argues BladeRoom cannot recover lost profits for the alleged loss of a data

10  center project in Prineville, Oregon - known as the "Sub-Zero" project - because there is no

11  evidence that the disclosure of its trade secrets or confidential information caused BladeRoom to

12  lose that project to DPR/Fortis.  The record demonstrates otherwise.



15  Mar Decl., at Ex. 40.

19  Id. at Ex. 41.

21  Id.

22  Id.

24  Id. at Ex. 126.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Id. at Exs. 116, 126.

2

3

4 Id. at Ex. 119.

5

6

7

8 Id. at Ex. 126.

9

10

11

12

13

14

15

16 Id. at Ex. 66.

17

18

19

20 Id.

21 at Ex. 128.

22

23

24 Dkt. No. 131.

25

26 Id. at Ex. 54, 81:13-16.

27

28 Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

███████████████████████████████████████████████████

████████████ (Id. at Exs. 37, 38), ██████████████████████

████████████████████████████████████ Id. at Ex. 54,

56:21-24.

A reasonable jury could find on this evidence that Facebook's disclosure of BladeRoom's

confidential information, and in particular ████████████████████████

caused BladeRoom to lose profits it would have otherwise realized from the Sub-Zero project.

Viewing the evidence in the light most favorable to BladeRoom, the jury could permissibly infer

that █████████████████████████████████████

██████████████████████████████████████████ The jury

could make this inference even though ███████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████████

In short, a jury would not need to resort to speculation or surmise to find that Facebook's

alleged disclosure of BladeRoom's confidential information caused lost profits related to the Sub-

Zero project. Facebook's motion for summary judgment will be denied to the extent it argues

against lost profits.

**E.     Standing**

Finally, Facebook once again argues that BRG lacks standing to pursue trade secret claims

because BRG is a non-exclusive licensee. The court has already addressed and rejected this

argument as improperly constrained to contractual rights rather than focused on the actual basis for

standing to sue for trade secretion misappropriation, which arises not from a license agreement but

from the possession of confidential information. Dkt. No. 191. Since reappearance of the

argument at this point raises no new issues, the outcome is the same. Facebook is not entitled to

summary judgment on BRG's claims for lack of standing for the same reasons its motion to

United States District Court
Northern District of California

1    dismiss on this topic was denied.

2    **IV.    ORDER**

3         Based on the foregoing, Facebook's Motion for Summary Judgment (Dkt. No. 384) is

4    GRANTED IN PART and DENIED IN PART.

5         The motion is granted as to Trade Secret 9.2 and to any combination trade secret

6    incorporating Trade Secret 9.  The motion is also granted as to any claim for restitution under the

7    UCL.  The motion is denied in all other aspects.

8

9         **IT IS SO ORDERED.**

10   Dated:  January 2, 2018

11

12                                         EDWARD J. DAVILA
                                           United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   Case No.: 5:15-cv-01370-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
     SUMMARY JUDGMENT