UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BLADEROOM GROUP LIMITED, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>EMERSON ELECTRIC CO, et al.,<br><br>　　　　Defendants. | Case No. 5:15-cv-01370-EJD<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Re: Dkt. No. 898 |

## I. INTRODUCTION

A jury returned a verdict in favor of BladeRoom Group Ltd. and Bripco (UK) Ltd.[1] on its claims against Emerson Electric Co., Emerson Network Power Solutions, Inc. and Liebert Corporation (collectively, "Emerson") for misappropriation of trade secrets and breach of contract. Dkt. No. 867. The jury awarded BladeRoom $10 million in lost profits damages, $20 million in unjust enrichment damages, and found by clear and convincing evidence that Emerson's misappropriation of trade secrets was willful and malicious.

Emerson now moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). Dkt. No. 898. BladeRoom opposes the motion. Having carefully considered the parties' arguments in light of the trial record, the court finds no legitimate basis to overturn any

---

[1] In this order, "BladeRoom" refers to both BladeRoom Group Ltd. and Bripco (UK) Ltd.
Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
1

portion of the verdict. Thus, Emerson's motion will be denied for the reasons explained below.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 50 permits a district court to grant judgment as a matter of law when "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." Estate of Diaz v. City of Anaheim, 840 F.3d 592, 604 (9th Cir. 2016) (internal quotations omitted). The Ninth Circuit has described this standard as "very high" and imposing a "high hurdle." Costa v. Desert Palace, Inc., 299 F.3d 838, 859 (9th Cir. 2002). To that end, the district court "can overturn the jury's verdict and grant [] a [Rule 50(b)] motion only if "'there is no legally sufficient basis for a reasonable jury to find for that party on that issue.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000)). Conversely, a verdict must be upheld when supported by substantial evidence, even if a contrary conclusion is possible. Janes v. Wal-Mart Stores, Inc., 279 F.3d 883, 888 (9th Cir. 2002). "Substantial evidence is 'such relevant evidence as reasonable minds might accept as adequate to support a conclusion.'" Mockler v. Multnomah Cnty., 140 F.3d 808, 815 n.8 (9th Cir. 1998); Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002).

The court must "disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 151. Functionally, this means "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.'" Id. (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d ed.1995)). However, the court may not make credibility determinations, weigh the evidence, or draw inferences therefrom. Id. at 150.

## III. DISCUSSION

### A. Misappropriation of Trade Secrets

Emerson argues BladeRoom failed to prove a cause of action for misappropriation of trade secrets because it needed to present expert testimony to prove the claim. Not so.

### i. Governing Authority

To sustain a claim for misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA"), a plaintiff must prove: "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." Cytodyn, Inc. v. Amerimmune Pharms., Inc., 160 Cal. App. 4th 288, 297 (2008).

"Misappropriation" includes the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," as well as the "[d]isclosure or use of a trade secret of another without express or implied consent" by a person who acquired the trade secret through improper means. Cal. Civ. Code § 3426.1(b); Silvaco Data Sys. v. Intel Corp., 184 Cal. App. 4th 210, 222 (2010) ("Under CUTSA, misappropriation of a trade secret may be achieved through three types of conduct: '[a]cquisition,' '[d]isclosure,' or '[u]se.' "). "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" but excludes "[r]everse engineering or independent derivation alone." Cal. Civ. Code § 3426.1(a).

### ii. Application

#### a. Existence of Trade Secrets

The jury found that BladeRoom proved by a preponderance of the evidence that it owned two trade secrets, Trade Secret 1 and Combination Trade Secret 8. Emerson's challenge to the jury's ownership finding boils down to one contention: it is unsustainable in the absence of technical expert testimony. This contention, however, is both legally erroneous and unpersuasive when compared to the record.

Initially, the court must dispel the notion that a plaintiff can never prove ownership of a trade secret without expert testimony. Information need not be complex, novel or outside the understanding of a layperson to constitute a trade secret. See Sinclair v. Aquarius Elecs., Inc., 42 Cal. App. 3d 216, 222 (1974) (holding that "[n]ovelty and invention are not requisite for a trade

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
3

secret as they are for patentability" and explaining that "a trade secret in the broad sense consists of any unpatented idea which may be used for industrial and commercial purposes"); see also Yield Dynamics, Inc. v. TEA Sys. Corp., 154 Cal. App. 4th 547, 562 (2007) (raising doubt that California law requires a trade secret to be unique or novel); see also Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 476 (1974). "Rather, the value of a trade secret arises from its secrecy and the ability to control whether, how and to whom it is disclosed." BladeRoom Grp. Ltd. v. Facebook, Inc., No. 5:15-cv-01370-EJD, 2018 WL 452111, *3 (N.D. Cal. Jan. 17, 2018) (citing DVD Copy Control Assn., Inc. v. Bunner, 31 Cal. 4th 864, 880-81 (2003)). This measure of value is reflected in CUTSA's definition of what can constitute a "trade secret," which makes no reference to novelty or complexity. Instead, a trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

CUTSA's broad definition may explain why Emerson was unable to cite one decision applying California law purporting to require expert testimony to prove a trade secret. Emerson did cite out-of-circuit and out-of-state cases, but none of these support a sweeping expert testimony requirement when it comes to trade secret existence or ownership. In Joseph v. Rassi, 58 Misc. 3d 1207 (N.Y. Sup. Ct. Jan. 4. 2018), the New York state trial court relied on the Delaware Superior Court's reasoning in ELENZA, Inc. v. Alcon Laboratories Holding Corporation, No. N14C-03-185 MMJ CCLD (Del. Super. Ct. Apr. 20, 2017), to announce that "[a]n expert witness is necessary to prove the presence of a trade secret." A close review of ELENZA reveals, however, that the Joseph court overstated its significance. ELENZA simply does not stand for an unqualified expert testimony requirement in trade secret cases. This court, therefore, does not imply from Joseph the same rule that Emerson does.

In Trident Products and Services, LLC v. Canadian Soiless Wholesale, Ltd., 859 F. Supp.

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
4

2d 771 (E.D. Va. 2012), the plaintiff essentially alleged that a former customer disclosed its formula for a chemical soil additive to another manufacturer, which manufacturer then began to supply a competing product. Because the parties disagreed about the extent of the products' similarity, the district court held the plaintiff needed expert testimony to explain issues outside the common knowledge of a juror, including "the commonalities of the formulae, the likelihood that [plaintiff's] microbes would wind up in another manufacturer's product, and the inventive process by which a competitor would have created its product." 859 F. Supp. 2d at 776. Rather than embodying a per se rule, Trident Products merely indicates that the need for expert testimony to prove a trade secret is determined on a case-by-case basis, like any other case arising under any other area of law. See Fed. R. Civ. P. 702 (providing that expert testimony is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue"); see also United States v. Seschillie, 310 F.3d 1208, 1212 (9th Cir. 2002) (holding that expert testimony is not required where the subject does not need expert "illumination" and the proponent is otherwise able to elicit testimony about the subject). The particular trade secret at issue in Trident Products - a chemical formula - and the conduct alleged to constitute misappropriation - the copying of the formula - make it understandable why a jury would need assistance from an expert to compare the two products; a visual comparison of the additive's components was impossible, and most jurors are not chemical engineers.

With no expert testimony requirement, the real question for this case becomes whether the evidence submitted by BladeRoom to prove trade secret ownership was so far beyond the common knowledge of a layperson that the jury required the assistance of expert testimony? The answer to that question is no, because BladeRoom proved it owned Trade Secret 1 and Combination Trade Secret 8 with testimony from fact witnesses.

BladeRoom's CEO, Paul Rogers, identified the trade secrets in their asserted forms and recounted at length how his experience with modular building techniques eventually led BladeRoom to develop "throughout the course of 2011" the technology that became BladeRoom's proprietary construction methods and designs for a warehouse-sized data center, including the

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
5

subassemblies known as the "chassis" and the "service cassette." Tr., Vol. 2, at 377:8-437:21; Tr., Vol. 3, 546:8-550:9. The assessment of whether Rogers was capable of creating these methods and designs is not outside the experience of a layperson. The jury, therefore, permissibly found that BladeRoom satisfied the predicate element of Civil Code § 3426.1(d) by showing it owned "information, including a formula, pattern, compilation, program, device, method, technique, or process" without expert testimony.

Testimony from Rogers and Barnaby Smith, one of BladeRoom's directors, also permitted the jury to find in BladeRoom's favor on the other two elements of Civil Code § 3426.1(d), and neither required expert testimony. On the topic of confidentiality, Rogers stated that BladeRoom maintains secrecy by using "employment contracts . . . written to protect [] confidential information;" non-disclosure or confidentiality agreements with clients, suppliers, and distributors; and a computer system with password protection. Tr., Vol. 3, at 550:12-24. He also stated that BladeRoom does not maintain all of its confidential information "in the same place," limits access to the business ("We don't just let anybody just wander into our business normally."), and marks documents "to be treated in confidence." Id. at 550:24-551:16. Smith testified that BladeRoom protects the details of its product with non-disclosure agreements with clients and curates the amount of information disclosed on its website. Tr., Vol. 6, at 1285:16-1287:18.

As to economic value, Rogers testified that no other company provides a similar data center product, and that the development of its confidential technology increased BladeRoom's sales from just under $50 million to just under $400 million. Tr., Vol. 3, at 552:19-553:4. In addition, Rogers identified several partners and clients who have utilized BladeRoom's confidential technology or purchased data centers incorporating the technology, including Metronade, Ark, and Mercedes Benz. Id. at 551:17-552:8. Crediting the testimony of BladeRoom's witnesses as true, the jury's finding on trade secret ownership is supported by substantial evidence.

Emerson's arguments to the contrary do not alter this outcome. Most of them are improper invitations for the court to reweigh or determine the credibility of evidence presented to the jury.

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

For example, Emerson argued at trial that BladeRoom's trade secrets were disclosed in patents. See, e.g., Tr., Vol. 20, at 4170:23-24 ("There is a mountain of patents, and we'll go through those later."); 4233:23-4234:4 ("Every phrase, and these are page after page, the patents of BladeRoom system, protected by key patents, a patented revolutionary air cooling system. All of it is protected by this large stack of patents. All of their information that they've been talking about in this case that they claim are trade secrets is right in there, and it was their burden to show you it wasn't in there."). The jury was apparently unpersuaded by Emerson's argument.

Furthermore, Emerson implies an extra burden requiring a trade secret plaintiff to disprove public disclosure as part of a prima facie case. But Emerson cites no authority for this contention, and relevant California law is against it. The secrecy element of a misappropriation claim required BladeRoom to make a prima facie showing on which the jury could find it made efforts that were "reasonable under the circumstances." Cal. Civ. Code § 3426.1(d); see Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658, 1667 (2003) ("To prevail, the party bearing the burden of proof on the issue must present evidence sufficient to establish in the mind of the trier of fact or the court a requisite degree of belief (commonly proof by a preponderance of the evidence)."); see also Jury Instructions, Dkt. No. 849, at Nos. 29, 30. BladeRoom did so here, triggering Emerson's burden to produce evidence that BladeRoom's efforts were not reasonable or that its trade secrets were not, in fact, secret. See Sargent Fletcher, 110 Cal. App. 4th at 1668 (holding that once a party "produces evidence sufficient to make its prima facie case, the burden of producing evidence shifts to the other party to refute the prima facie case"). Though Emerson presented evidence in support of a public disclosure theory, the verdict shows the jury was seemingly unmoved by it.

Because substantial evidence supports the jury's finding that BladeRoom owned Trade Secret 1 and Combination Trade Secret 8, Emerson's challenge to that portion of the verdict is rejected.

### b. Disclosure or Use by Improper Means

In a similar argument, Emerson believes the jury's misappropriation verdict is unsupportable without "[e]xpert evidence comparing the alleged trade secrets to what Emerson

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
7

designed and built." This argument fares no better than the preceding one.

Much like the ownership question, BladeRoom's burden was to admit sufficient evidence on which the jury could find in its favor on the issue of misappropriation; that is, BladeRoom needed to show to the jury's satisfaction that Emerson disclosed or used its trade secrets by way of improper means. See Cytodyn, Inc., 160 Cal. App. 4th at 297 (2008); see also Sargent Fletcher, 110 Cal. App. 4th at 1669 ("The plaintiff's proof that another party used plaintiff's trade secret, to which that party gained access (properly, for a limited purpose, or otherwise), and that the party's identical or similar product incorporates the same design, is a prima facie showing that the party did not independently derive or reverse engineer the product."); see also Final Jury Instructions, Dkt. No. 849, at Nos. 34-36. BladeRoom could do so with circumstantial evidence because direct evidence of misappropriation is rare. UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co., 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007). Comments by another district court on this topic are particularly relevant to this case:

> It is well recognized with respect to trade secrets that:
>
> [m]isappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construction of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything.

Q-Co Indus., Inc. v. Hoffman, 625 F. Supp. 608, 618 (S.D.N.Y. 1985) (quoting Greenberg v. Croydon Plastics Co. Inc., 378 F. Supp. 806, 814 (E.D. Pa. 1974)).

Misappropriation through disclosure occurs "if a person knew or had reason to know at the time of a trade secrets disclosure that his or her knowledge of the trade secret was '[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.'" BladeRoom Group Ltd. v. Facebook, Inc., No. 5:15-cv-01370-EJD, 2018 WL 514923, at *7 (N.D. Cal. Jan. 23, 2018) (quoting Cal. Civ. Code § 3426.1(b)(2)). Here, BladeRoom presented substantial evidence in support of a misappropriation by disclosure theory. The agreement between BladeRoom and

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
8

Emerson "giving rise to a duty to maintain secrecy" and limiting the use of confidential information was admitted. Trial Ex. No. 2; Tr., Vol. 2, at 375:4-20. The agreement permitted Emerson to use BladeRoom's information "only for the purpose of internal evaluation of whether to enter into a business relationship."

BladeRoom's Rogers testified how Emerson obtained his company's confidential information: teams from Facebook and Emerson visited BladeRoom's facilities in the United Kingdom during the same week in 2012, and Rogers shared with Emerson's team information and several documents depicting the methods and designs underlying a BladeRoom modular data center. Tr., Vol. 3, Dkt. No., at 575:10-14; 577:5-578:16; 582:11-586:13; 599:14-600:24. In addition, the Emerson team toured a factory where the chassis was in production, and viewed a "live" data center where prototypes of the service cassette and the chassis were displayed. Id. at 586:14-588:8. Fred Rebarber, who was a member of the visiting Emerson team, confirmed the exchange of information. Tr., Vol. 13, at 2794:10-2796:1.

The evidence also revealed a collection of instances from which the jury could permissibly infer that Emerson failed to observe its contractual duty by disclosing BladeRoom's confidential information. First, BladeRoom's Rogers stated that despite efforts to keep the teams from Facebook and Emerson apart during their visits, he received a subsequent email from Emerson's David Gerhart indicating the two teams nonetheless met while in the United Kingdom. Tr., Vol. 3, at 590:12-17. In fact, the meeting was arranged in advance, unbeknownst to Rogers. Trial Ex. No. 919; Tr., Vol. 9, at 1962:16-21. According to Emerson's Rebarber, one purpose of this meeting was to understand Facebook's "level of interest and engagement in BladeRoom." Tr., Vol. 13, at 2808:7-9; Trial Ex. No. 880. Rebarber wrote in his notes, along with technical information describing BladeRoom's technology:

> This is facebook's second visit to BladeRoom. Tim[2] Tse mentioned a potential four BladeRooms in Sweden. Tim commented that they could get the BladeRooms manufactured, installed and in operation

---

[2] The court understands Rebarber to reference Facebook's Tin Tse, rather than another individual named Tim Tse.

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

9

> much earlier than the current planned structures would be available which has been in planning for a year with DPR and Fortis Construction . . . . Although Facebook says they are still evaluating BladeRoom, BladeRoom commented that they are in the quotation stage. Tim also mentioned that technically they are satisfied with BladeRooms approach and they are confident that BladeRoom could make some changes that facebook requires (potential elimination of DX back-up, ceiling height, cable tray management).

Second, Facebook's Tin Tse testified about a meeting between Facebook and Emerson in St. Louis in July, 2012. Tse agreed that though Emerson was "starting from scratch" with a modular data center product at the time, the purpose of the meeting was to determine whether Emerson could build a data center comparable to BladeRoom's product. Tr., Vol. 7, at 1448:7-9; 1449:10-15. Tse later wrote an email to his supervisor, Jay Park, on July 27, 2012, about his upcoming goals. Tse wrote, in pertinent part:

> I am dropping the indirect solution with Bladeroom and will put it on Emerson's plate . . . .
>
> 5) Work with Emerson to help them develop modular solution similar to Bladeroom . . . .

Trial Ex. No. 1456.

Tse testified that consistent with his July 27th email, he worked closely with Emerson between August and December 2012 to develop a modular data center solution and used BladeRoom's terminology during his communications with Emerson. Tr., Vol. 7, at 1467:3-9; 1468:19-20. In one email from Emerson's Wilcox to Tse and others at Facebook from this time period, Wilcox specifically references "the approach taken by others in the modular solution business (UK) that has the air-handler located at the end of the data halls to allow for stacked solutions." Trial Ex. No. 1662.

Third, Tse testified that teams from Facebook and Emerson participated in a "design charrette" in August, 2012, the purpose of which was to help Emerson understand how to meet Facebook's need for a modular data center. Tr., Vol. 7, at 1473:18-1474:7. The evidence showed that during the charrette, Tse presented the "BladeRoom Solution," which presentation included parts of the proposal that BladeRoom made to Facebook for the construction of Lulea 2. Trial Ex. Nos. 895, 2034. Emerson's Wilcox wrote in notes from the meeting in reference to BladeRoom:

> Not moving forward beyond technology approach due to business constraints/concerns. (Trial Ex. No. 895; Tr., Vol. 10, at 2062:19-2063:5);
>
> Concerns with Bladeroom overall container size due to 28 cabinet building block. (Trial Ex. No. 895);
>
> Looking for a merger of Emerson's and Bladeroom best practices of design. (Trial Ex. No. 895);
> Facebook Psychometric chart is now driven as a sacred cow - not yet up for discussion . . . . Mentioned that the stage control from Bladeroom is significantly ahead of Facebook concepts - this is an area we must focus in our presentation to show we have value. (Trial Ex. No. 895).

Fourth, on September 19, 2012, Emerson's Wilcox emailed Facebook's Tse requesting a "short write-up or more detail" about Facebook's concerns regarding the media used for air cooling. Trial Ex. No. 995. Tse responded there were three ways to control the media capacity, including "[s]taging and By-pass dampers (the other vendor in the UK)." Id. Tse confirmed he was referring to BladeRoom as the "other vendor in the UK." Tr., Vol. 7, at 1470:5-8.

Fifth, Emerson presented its modular data center design for Lulea 2 to Facebook on October 30, 2012. Tr., Vol. 10, at 2086:9-2088:9. Emerson's Jon Carr emailed notes from the presentation meeting to Wilcox on October 31, 2012, which included the entry: "Do not use the word 'Cassette' - This is Bladeroom terminology." Trial Ex. No. 945. The notes also included this entry: "Blade Room back draft damper - take a look at it. Marco likes it . . ." Id. In addition, Emerson's Michael Rockwell emailed Wilcox that same day about Facebook's request for a copy of Emerson's presentation and Emerson's concerns about providing it. Trial Ex. No. 1114. Rockwell wrote: "I agree with this concern, especially given the Bladeroom related disclosures from facebook yesterday . . . ." Id.

Moreover, the jury could find based on the evidence that Emerson disclosed BladeRoom's trade secrets in patent applications. BladeRoom's Rogers stated that after receiving BladeRoom's information, Emerson applied for patents based on BladeRoom's technology. Tr., Vol. 3, at 623:23-624:12. Emerson's Wilcox confirmed that Emerson's patents cover inventive aspects of Lulea 2, including the Unit I.T. and the sectional modularized air handling unit. Tr., Vol. 10, at

2126:16-2127:6; Trial Ex. No. 1260.

Emerson's challenge to the misappropriation verdict - focused solely on improper use - collapses against the disclosure evidence, all of which independently supports the jury's finding. The jury's examination of disclosure by improper means did not require the assistance of an expert, and Emerson does not argue otherwise in this motion.

In any event, the jury was also capable of analyzing evidence of improper use without technical expert testimony. The court has previously explained that a plaintiff need not undertake a patent infringement analysis to prove an improper use claim, because "'use' is not such an inflexible term when it comes to trade secret misappropriation." BladeRoom Group Ltd., 2018 WL 514923, at *8. Indeed, "the actor need not use the trade secret in its original form," and "unauthorized use need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability." Restatement (Third) of Unfair Competition § 40 cmt. c (1995). "[A]n actor is liable for using the trade secret with independently created improvements or modifications if the result is substantially derived from the trade secret." Id.; accord Mangren Res. & Dev. Corp. v. Nat'l Chem. Co., Inc., 87 F.3d 937, 944 (7th Cir. 1996) ("[I]f trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that law provides would be hollow indeed.").

The technical aspects of the trial evidence were not so complex that the jury was unable to validly find that Emerson's design for Lulea 2 was substantially derived from BladeRoom's trade secrets. A layperson is able to compare Rogers' recitation of the trade secrets with the evidence describing Emerson's design and construction of Lulea 2 and determine whether Lulea 2 was "substantially derived" from the trade secrets, given Emerson's access to BladeRoom's confidential information and its prior lack of experience with a modular data center solution. See, e.g., Tr., Vol. 10, at 2088:10-2113:17; Tr., Vol. 14, at 3029:23-3036:3.

Finally, Emerson's argument that BladeRoom failed to prove any element of a misappropriation or breach of contract claim neglects the substantial evidence recited above, all of

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
12

which the jury could have used to establish the requisite elements. Emerson also invites the court to accept evidence it finds convenient to its position, reject contrary evidence, and draw inferences from the evidence in Emerson's favor. The court cannot do so on this motion. See Reeves, 530 U.S. at 151

In sum, the absence of expert testimony does not undermine the substantial evidence supporting the jury's misappropriation verdict, all of which was within the reach of a layperson. Thus, Emerson is not entitled to relief under Rule 50(b).

### B. Causation

The jury found that Emerson's misappropriation of trade secrets was a substantial factor in causing harm to BladeRoom. Emerson argues the evidence is insufficient to support this finding because it does not show that BladeRoom would have been awarded the Lulea 2 contract but for Emerson's conduct. Emerson's argument is misplaced as both a legal and factual matter.

#### i. Governing Authority

The court instructed the jury regarding causation under California law, which is the same for both contract and tort claims. See Ortega v. Kmart Corp., 26 Cal. 4th 1200, 1205 (2001) (holding that "substantial factor" causation is a factual question for the jury unless the facts regarding causation are undisputed); see also Tribeca Cos., LLC v. First Am. Title Ins. Co., 239 Cal. App. 4th 1088, 1103 (2015).

"'The test for causation in a breach of contract . . . action is whether the breach was a substantial factor in causing the damages.'" Id. (quoting US Ecology v. California, 129 Cal. App. 4th 887, 909 (2005)). "Similarly, in tort cases, 'California has definitively adopted the substantial factor test.'" Id. (quoting Rutherford v. Owens-Illinois, Inc., 16 Cal. 4th 953, 968-69 (1997)). Under that test, "'a cause in fact is something that is a substantial factor in bringing about the injury.'" Id. (quoting Rutherford, 16 Cal.4th at 968-69).

"The term 'substantial factor' has not been judicially defined with specificity, and indeed it has been observed that it is 'neither possible nor desirable to reduce it to any lower terms.'" Rutherford, 16 Cal. 4th at 696. The California Supreme Court has suggested, however, that

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
13

1  "[u]ndue emphasis should not be placed on the term 'substantial.'" Id. But at the same time, "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damages or loss is not a substantial factor." Id.

### ii. Application

Emerson argues that in a case like this one involving the loss of a contractual opportunity, BladeRoom needed to show it would have obtained the contract for Lulea 2 from Facebook had Emerson not breached the confidentiality agreement or misappropriated its trade secrets. That framing is not completely accurate under California law, however, because it is not consistent with the cause-and-effect language of the substantial factor test. BladeRoom's burden was not to affirmatively prove it would have otherwise obtained the Lulea 2 contract, but rather to admit sufficient evidence upon which the jury could find that Emerson's conduct was a substantial factor in causing BladeRoom to lose or not be awarded the Lulea 2 contract. Though subtle, the distinction is important because the record shows that BladeRoom satisfied its burden under that standard.

Facebook's Park testified that BladeRoom and Emerson were the only two companies being considered for the construction of Lulea 2. Tr., Vol. 9, at 1858:7-10. Moreover, the jury could reasonably infer from the testimony of Facebook's witnesses, Tse and Marco Magarelli, that only BladeRoom satisfied all of Facebook's design preferences, that Facebook was willing to work with BladeRoom's proposal submitted on July 20, 2012, and that Facebook was "probably going to use BladeRoom for Lulea 2." Tr., Vol. 7, at 1525:23-1526:19; Tr., Vol. 12, at 2578:11-2579:1; Trial Ex. No. 1455. The jury could also infer from the evidence - including the short timeframe in which Emerson developed a modular solution and the subsequent, ongoing interactions between Facebook and Emerson after meeting with BladeRoom in the United Kingdom - that Emerson would not have otherwise been able to compete against BladeRoom in the two-business race for Lulea 2, and could not have submitted a winning proposal in October, 2012, had Emerson not misappropriated BladeRoom's confidential information. In sum, substantial evidence in the record supports the jury's finding that Emerson's conduct was a

substantial factor in causing BladeRoom to lose the Lulea 2 contract.

Emerson's argument to the contrary is unpersuasive. For the most part, it employs a backwards Rule 50(b) analysis by citing to causation evidence in its favor but ignoring the evidence supporting the jury's verdict. As an example, Emerson relies on evidence suggesting Facebook was considering BladeRoom only for the data hall portions of Lulea 2, but overlooks that the jury could permissibly find that Emerson could not have competed with BladeRoom at all unless it submitted a design similar to BladeRoom's product for that portion of the data center. Trial Ex. No. 926; Tr., Vol. 8, at 1708:17-20. And because of that evidence and the inferences reasonably drawn therefrom, Emerson's challenge to the amount of the unjust enrichment award falls apart. As Emerson itself recognizes, it was *Emerson's* burden to prove any portion of its earnings from Lulea 2 not attributable to BladeRoom's trade secrets. See Restatement (Third) of Unfair Competition § 45 cmt. f (1995). To the extent Emerson presented evidence for the jury to parse its earnings between the data hall and other portions of that project, the jury was free to disbelieve it. It apparently did in some form, instead accepting evidence that Emerson would not have been compensated for Lulea 2 had it not used BladeRoom's trade secrets.

Emerson also argues that BladeRoom "terminated its longshot play" for Lulea 2. But as the embellishment suggests, Emerson supports the argument with its own interpretation of cherry-picked evidence. The evidence was not undisputed on this point.

Finally, Emerson argues it could not have used BladeRoom's confidential information in its proposal for Lulea 2 because, in its view, any contractual confidentiality restrictions expired on August 17, 2013. The court rejected that interpretation of the contract in an order filed during trial (Dkt. No. 839) and finds no reason to reconsider that issue for this motion.

Because the jury's causation verdict is supported by substantial evidence, Emerson's Rule 50(b) motion on that topic must be denied.

### C. The Willful and Malicious Finding

Emerson's challenge to the jury's willful and malicious finding requires little discussion because it rests upon issues already decided by the court. Emerson argues BladeRoom "never

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
15

gave Emerson clear or fair notice regarding what precisely were the trade secrets." The court, however, found otherwise at summary judgment. Dkt. Nos. 493, 494. Nothing new is asserted now.

Furthermore, Emerson's representation of "massive differences between [BladeRoom's] standard offering and what Facebook asked Emerson to design and build" does not cut against the verdict for two reasons. First, that statement embodies an evidentiary inference by Emerson adding no value to this motion. Second, it reflects a narrow approach to the types of evidence that can prove trade secret misappropriation. But as the court has explained, the jury could permissibly find misappropriation based on inferences drawn from the evidence, including inferences drawn from circumstantial evidence, even if Emerson's design for Lulea 2 was not an exact reproduction of BladeRoom's trade secrets. See Restatement (Third) of Unfair Competition § 40 cmt. c (1995).

Accordingly, the court will not disturb the finding that Emerson engaged in willful and malicious misappropriation of trade secrets.

### D. Damages

Emerson argues the jury's damages awards are unsustainable because (1) the jury was not asked to apportion damages among the trade secrets, (2) the evidence of future lost profits was speculative, and (3) the amount of unjust enrichment is either a double-recovery or based on speculative evidence. These bases are each unpersuasive.

The court has already considered, and rejected, the first basis. Dkt. No. 738. Relevant California authority does not require an apportionment of damages. In the absence of such a rule, BladeRoom's theory was not legally improper in the context of this case; that is, BladeRoom could argue that since its trade secrets encompass the designs and methods used to create parts of a unified structure, the misappropriation of any of the asserted trade secrets would have caused all of the damages it sought.

The second basis is equally unavailing. Emerson's argument focuses only on problems with the evidence of future lost profits, not the evidence of actual lost profits. Since the verdict does not specify which type of profits the jury awarded, and since the latter type could

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
16

independently support the verdict, there is nothing gained from examining the sufficiency of the future lost profits evidence.

The third basis similarly fails. Like lost profits, the jury was not asked to specify the basis for the amount of unjust enrichment damages it awarded. As such, Emerson can only speculate exactly how the jury measured unjust enrichment, and certainly cannot show with any reasonable certainty that the jury double-counted "Emerson's supposed operating profit" from Lulea 2.

Furthermore, the court disagrees that BladeRoom's unjust enrichment evidence "is contrary to the basic foundation of disgorgement damages in trade secret misappropriation matters." As the court explained:

> While the sale of Emerson Network Power may represent a unique form of unjust enrichment damages - it is not "sales" in the classic sense - no authority provides that an award cannot be made based on the sale of a business so long as causation and the fact of existing damages are proven. Furthermore, Emerson is in the better position to show any portion of the sale not attributable to the trade secret, which observation conforms to the purpose of the burden shifting occurring when unjust enrichment damages are at issue.

Dkt. No. 850.

The unpublished opinion cited by Emerson, Litton Systems, Inc. v. Ssangyong Cement Industrial Co., Ltd., 107 F.3d 30 (Fed. Cir. 1997), does not provide reasons to alter that analysis. There, the Federal Circuit understandably found the calculation of unjust enrichment damages "unsupported in the law of unfair competition" because the district court based it on an *expected* stream of income. Here, the unjust enrichment evidence described *realized* profits from the sale of Emerson Network Power.

In short, Emerson has not shown an entitlement to judgment as a matter of law on any portion of the damages award.

### E. Standing

The standing of BladeRoom Group Ltd. is challenged for a third time. Addressing this issue twice before (Dkt. Nos. 191, 493), the court determined that BladeRoom Group Ltd. has standing since it possesses confidential information that could be misappropriated. Emerson raises

Case No.: 5:15-cv-01370-EJD
ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

17

nothing new, and its argument for judgment on this issue is rejected.

## IV. ORDER

Based on the foregoing, Emerson's Motion for Judgment as a Matter of Law (Dkt. No. 898) is DENIED.

**IT IS SO ORDERED.**

Dated: August 3, 2018

EDWARD J. DAVILA
United States District Judge