UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BLADEROOM GROUP LIMITED, et al., | Case No. 5:15-cv-01370-EJD |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEYS' FEES AND COSTS** |
| EMERSON ELECTRIC CO, et al., | Dkt. No. 962 |
| Defendants. | |

Plaintiffs BladeRoom Group Limited and Bripco (UK) Limited's (collectively "BladeRoom") prevailed at trial on a claim for trade secret misappropriation. The jury awarded compensatory damages of $30 million and the Court later awarded exemplary damages in the amount of $30 million under California Code of Civil Procedure §3426.4 and prejudgment interest. Dkt. No. 956.

Pending before the Court is BladeRoom's motion for attorneys' fees and costs. BladeRoom seeks $17,002,267.76 in fees for work performed by Farella Braun ("Farella"), $3,379,350.00 for work performed by in-house counsel, $71,744.95 for work performed by UK-based outside counsel, and $3,605,616.37 in costs.

On December 11, 2019, the Special Master filed a Report and Recommendation regarding BladeRoom's motion ("R&R"). Dkt. No. 1028. The Special Master found BladeRoom's attorney billing records were "improper and in various ways problematic under the relevant caselaw and facts of this case." *Id*. 31. Therefore, the Special Master recommended a 40% reduction of BladeRoom's fees to "mirror[] the percentage of billing records that the Special Master has

identified as problematic." R&R at 19. The Special Master stated that the "reduced amount more appropriately represent[ed] BladeRoom's reasonable attorneys' fees in this litigation." *Id.* The 40% reduction of BladeRoom's lodestar left BladeRoom with a final lodestar and attorneys' fee recovery of $12,272,017. The Special Master recommended taxing costs in the amount of $2,495,161.87. Lastly, the Special Master recommended that his fees be split evenly between BladeRoom and Defendants Emerson Electric Co., Emerson Network Power Solutions Inc., and Liebert Corporation (collectively "Emerson").

The parties filed their respective objections to the R&R (Dkt. Nos. 1031, 1032) and responses to objections (Dkt. Nos. 1035, 1036). The matter was heard via telephonic conference on March 26, 2020. Based upon all pleadings filed to date, the extensive evidentiary record, and the comments of counsel, the Court adopts the R&R with the exceptions noted herein.

**A.    STANDARDS**

The parties agree that the lodestar method of determining attorney's fees applies. The lodestar is calculated by multiplying the number of attorney hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate. *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996). "The reasonableness of an hourly rate should be determined based on the rates prevailing in the community for 'lawyers of reasonably comparable skill, experience and reputation.'" *Lewis v. Silvertree Mohave Homeonwers' Ass'n, Inc.*, No. 16-3581 WHA, 2017 WL 5495816, at *3 (N.D. Cal. Nov. 16, 2017) (quoting *Blum v. Stenson*, 465 U.S. 886, n.11 (1984)). There is a strong presumption that the lodestar figure represents a reasonable fee. *Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981, 986 (N.D. Cal. 2005) (citing *Jordan v. Multnomah Cty.*, 815 F.2d 1258, 1262 (9th Cir. 1987)). "That presumption is particularly forceful where, as here, the fees were billed to and actually paid by [BladeRoom] during the course of the litigation." *Stonebrae, L.P. v. Toll Bros., Inc.*, No. 08-221 EMC, 2011 WL 1334444, at *6 (N.D. Cal. April 7, 2011); *see also Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, No. 15-4618 WHO, 2017 WL 6059271, at *11 (N.D. Cal. Dec. 7, 2017) ("[t]he fact that the fees have been paid by

[defendant] . . . 'adds weight to the presumption of reasonableness'" (quoting *Stonebrae*, 2011 WL 1334444, at *6)).

**B.    DISCUSSION**

The Court has conducted a *de novo* review of the R&R.  The Court concurs with the Special Master's finding that the hourly rates for Farella's attorneys were "wholly reasonable" and consistent with market rates in the San Francisco Bay Area.  R&R at 6, n.2.  Each of the parties' discrete objections to the Special Master's assessment of allowable fees are discussed separately below.  Whether the Special Master's recommended across-the-board 40% reduction to all fees should be adopted is discussed in Section 5 of this Order.

**1.    Emerson's Objection re Expert Witness Fees**

BladeRoom seeks more than $2 million in expert witness fees pursuant to the California Uniform Trade Secrets Act ("CUTSA"), specifically California Civil Code section 3426.4.  Section 3426.4 states, in relevant part:

> If . . . willful and malicious misappropriation exists, the court may award reasonable attorney's fees and costs to the prevailing party. Recoverable costs hereunder shall include a reasonable sum to cover the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party.

Cal. Civ. Code § 3426.4.  Prior to 2006, §3426.4 permitted an award of only attorney's fees to the prevailing party.  *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1111 n.13 (9th Cir. 2007).  In 2006, the statute was amended to permit the award of costs as well as attorney's fees.  *Id*.  The Special Master determined that under the rule of *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), §3426.4 applied because it is a substantive rather than procedural statute. R&R at 22.  Accordingly, the Special Master concluded that BladeRoom was entitled to expert witness fees under §3426.4.

Emerson objects to any award of expert witness fees.  Emerson contends that the Special Master mistakenly applied §3426.4 to award these fees instead of applying Federal Rule of Civil

Procedure 54(d), in conjunction with 28 U.S.C. §§ 1821 and 1920, which do not authorize recovery of expert witness fees.[1] The Court disagrees.

In *Hanna v. Plumer*, 380 U.S. 460 (1965), the Supreme Court set forth the test for resolving conflicts between state law and the Federal Rules. The first step is to determine whether the Federal Rule "is 'sufficiently broad' to cause a 'direct collision' with the state law, or implicitly, to 'control the issue' before the court, thereby leaving no room for the operation of that law." *Burlington Northern R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987) (quoting *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-750, and n. 9 (1980)). If so, "[t]he Rule must then be applied if it represents a valid exercise of Congress' rulemaking authority, which originates in the Constitution and has been bestowed on this Court by the Rules Enabling Act, 28 U.S.C. § 2072.3." *Id.* (citing *Hanna*, 380 U.S. at 471-74). The second step of the analysis is to look at the "twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of equitable administration of the laws." *Hanna*, 380 U.S. at 468. The Supreme Court has further instructed, "[w]e do not wade into *Erie*'s murky waters unless the federal rule is inapplicable or invalid." *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010).

Here, Federal Rule of Civil Procedure 54(d) authorizes the award of "costs" to the prevailing party. Title 28 United States Code sections 1920 and 1821 specify the categories of costs that are recoverable. Section 1920 "now embodies Congress' considered choice as to the kinds of expenses that a federal court may tax as costs against the losing party." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 440 (1987). Expert witness fees are not listed in section 1920, and section 1821(b) limits recoverable witness fees to $40 per day for attendance at depositions and trial. Accordingly, federal courts limit recovery of expert witness fees to $40 per

---

[1] *See also* Civil Local Rule 54-3 ("Witness Expenses. Per diem, subsistence and mileage payments for witnesses are allowable to the extent reasonably necessary and provided for by 28 U.S.C. § 1821. No other witness expenses, including fees for expert witnesses, are allowable.")

Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEYS' FEES AND COSTS

4

day.  *See Rimini Street, Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 877 (2019) (When "a prevailing party seeks reimbursement for fees paid to its own expert witnesses, a federal court is bound by the limit of §1821(b), absent contract or explicit statutory authority to the contrary.") (quoting *Crawford*, 482 U.S. at 439).

In *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1168 (9th Cir. 1995), the district court, sitting in diversity, awarded the prevailing party costs, including expert witness fees, under California's offer of judgment rule stated in Code of Civil Procedure section 998(c).  Faced with what was perceived as a "choice of law  . . . between state and federal expert witness cost provisions," the *Aceves* court concluded that the district court erred in applying California law.  The *Aceves* court reasoned:

> California law controls the substance of this lawsuit, but federal law controls the procedure by which the district court oversaw the litigation.  *See Hanna v. Plumer*, 380 U.S. 460, 473, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).  Because reimbursement of expert witness fees is an issue of trial procedure, federal law should have controlled this costs issue, unless one of two factors indicated otherwise. State procedure would only have applied if the pedigree of the federal rule could not be traced back to a federal statute or a Federal Rule of Civil Procedure, duly enacted pursuant to the Rules Enabling Act, *see id.* at 470–71, 85 S.Ct. 1136, or if the federal rule created an incentive to shop for the federal forum, *see id.* at 467–68, 85 S.Ct. 1136. *See also Olympic Sports Prods., Inc. v. Universal Athletic Sales Co.*, 760 F.2d 910, 914–15 (9th Cir. 1985).

*Id.* at 1167–68.

Although the *Aceves* decision provides some guidance, it is not controlling here because BladeRoom is seeking expert witness fees under a different California statute.  Moreover, the premise of the *Aceves* court's decision was that the federal and state offer of judgment rules were procedural, not substantive.  In contrast, the entitlement to expert witness fees under §3426.4 is arguably a substantive provision.  In *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099 (9th Cir. 2006), the Ninth Circuit held that the district court properly applied the attorney's fees provision of §3426.4 under the rule of *Erie*.  *Id.* at 1111.  The *CRST* court first observed that "[w]e have held that when state statutes authorize fee awards to litigants in a

particular class of cases, the statutes are substantive for *Erie* purposes if there is no 'direct collision' with the Federal Rules." *Id.* The *CRST* court noted that §3426.4 was such a statute in that it applied only in cases where a trade secret misappropriation claim was filed. *Id.*[2] The *CRST* also reasoned that the attorney's fees provision of §3426.4 did not supplant or collide directly with any Federal Rule and embodied a substantive state policy against the frivolous filing of trade secret claims. *Id.*

The cost-shifting provision of §3426.4 was not at issue in *CRST*. Nevertheless, this Court finds that the *CRST* court's reasoning regarding the attorney's fees provision applies with equal force to the cost-shifting provision. The cost-shifting provision of §3426.4 applies only in trade secret misappropriation cases and does not collide directly with the federal cap on daily witness fees. Section 3426.4 provides for the recovery of expert witness fees only if there is a finding of willful and malicious misappropriation, whereas the federal cap on daily witness fees is one of many taxable costs available to a prevailing party. The two rules can be reconciled because they answer different questions. *Shady Grove*, 559 U.S. at 410. Consistent with *CRST*, in *RBC Bearings Inc. v. Caliber Aero, LLC*, No. 12-1442 FMO, 2016 WL 6562068, at *11 (C.D. Cal. Aug. 1, 2016), the court construed *CRTS Van Expedited* as holding that federal courts sitting in diversity may properly award attorney's fees *and* costs under §3426.4. The *RBC* court accordingly awarded expert witness fees under §3426.4. In *Eldorado Stone LLC v. Renaissance Stone*, No. 04-2562 JM, 2007 WL 3308099, at *6 (S.D. Cal. Oct. 24, 2007), which was decided before *CRST*, the court similarly awarded expert witness fees to the prevailing party under

---

[2] The case of *In re Larry's Apartment, L.L.C.*, 249 F.3d 832 (9th Cir. 2001) is distinguishable from *CRST* in that the statute at issue in *Larry's Apartment* was procedural, not substantive. In *Larry's Apartment*, the trial court awarded attorneys' fees as a sanction for attorney misconduct. On appeal, the Ninth Circuit held that under *Erie*, federal law, not Arizona law, governed. The Ninth Circuit explained that when fees are based upon the misconduct of an attorney or a party to the litigation, rather than upon a matter of substantive law, the matter is procedural. *Id.* at 838. "Imposition of sanctions in that instance 'depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation.'" *Id.* at 838 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 53 (1991)). Here, imposition of fees and costs under section 3426.4 depends on which party wins the lawsuit, not on how the parties conducted themselves during the litigation.

§3426.4. This Court joins *RBC Bearings* and *Eldorado Stone* in concluding that § 3426.4 applies.[3] This result is bolstered by step two of the *Hanna* analysis. The application of §3426 in state court and not in federal court may very well lead to forum-shopping and the possible inequitable administration of the laws. Although BladeRoom chose to initiate suit in federal court, there may be future diversity cases in which the defendant will be able to remove the case to federal court and seek to eliminate exposure to liability under §3426.4.

BladeRoom's motion for expert witness fees is granted. The Court adopts the recommendation of the Special Master and awards BladeRoom $2,017,851.59 in expert witness fees.

### 2. Emerson's Objections re In-House Counsel and Foreign Counsel Fees, Failure to Apportion, and Failure to Consider the Lack of Success

#### a. In-House Counsel Fees

BladeRoom seeks $3,379,350.00 in attorneys' fees for work performed by BladeRoom's General Counsel, Michael Joy. Mr. Joy has been a practicing barrister in England since 1997. Decl. of M. Joy ¶ 2 (Dkt. No. 962-7). BladeRoom paid him a salary. Mr. Joy spent 5,199 hours working on this case. BladeRoom applied a $650 hourly rate to Mr. Joy's work to arrive at the requested amount of $3,379,350.00.

The Special Master reviewed Mr. Joy's record and found that "for the majority of the time that [Mr.] Joy was working with BladeRoom attorneys, he was acting in the traditional role of in-house counsel; that is, he was acting as a liaison between the client and the legal team." R&R at 14. The Special Master also found "[n]o persuasive evidence" that Mr. Joy was "a core part of the BladeRoom legal team or that his litigation or skills were critical to the success of the case." *Id.* Instead, Mr. Joy "brought more of his technical expertise to the table, which is more of a

---

[3] This result is also consistent with *Clausen v. M/V New Carissa*, 339 F.3d 1049 (9th Cir. 2003) (affirming award of expert witness fees under Oregon Oil Spill Act); *Base v. FAC US LLC*, No. 17-1532 JCS, 2020 WL 363006, at *7 (N.D. Cal. Jan. 22, 2020) (awarding expert witness fees under California's Song-Beverly Act).

traditional in-house counsel role." *Id.* Further, the Special Master found that when Mr. Joy was acting as an attorney rather than a technical advisor, Mr. Joy's work was at times duplicative of the efforts of outside counsel. *Id.* at 15. The Special Master concluded that BladeRoom was not entitled to recoup the entirety of Mr. Joy's attorneys' fees and applied a 40% reduction to his fees. *Id.* at 19.

Emerson objects to the R&R to the extent it fails to deduct Mr. Joy's fees in full. First, Emerson argues that Mr. Joy's fees are not recoverable because he is not a U.S. attorney. Second, Emerson contends that there is not reasonable support for any of Mr. Joy's time. Emerson points out that Mr. Joy did not maintain contemporaneous time records and characterizes Mr. Joy's declaration in support of the fee request as "a self-serving declaration prepared years after much of the work was allegedly performed." Defs.' Obj. 3. Third, Emerson argues that none of Mr. Joy's fees are recoverable based on the Special Master's findings that Mr. Joy acted primarily in a traditional in-house role and the legal work he did perform was duplicative of the efforts of outside counsel.

The Court overrules Emerson's first two objections. BladeRoom is entitled to recover fees for Mr. Joy's work even if he is not a U.S. attorney. In *Winterrowd v. Am. Gen. Annuity Ins. Co.*, 556 F.3d 815 (9th Cir. 2009), the plaintiffs sought an award of attorney's fees pursuant to California Labor Code section 218.5. *Id.* at 825. The district court determined that plaintiffs could not recover attorney's fees for the portion of work performed by an out-of-state attorney due to his alleged violation of the State Bar Act or the Central District of California's Local Rules. *Id.* at 820. The Ninth Circuit determined that the State Bar Act did not control, and looked instead to the Central District's rules (which allow for out-of-state attorneys to participate pro hac vice) and federal case law to determine whether the plaintiffs may recover for the attorney's work. *Id.* at 822. The Ninth Circuit observed that case law suggested "two ways" in which the plaintiffs could recover the attorney's fees: (1) if the attorney would have "certainly been permitted to appear pro hac vice"; and (2) if the attorney's conduct "did not rise to the level of 'appearing' before the

district court." *Id.* at 823. As to the second basis for recovering attorney's fees, the *Winterrowd* court reasoned: "This court has permitted fee recovery for the work of paralegals, database managers, legal support, summer associates, and even attorneys who have yet to pass the bar. [citation]. These participants in the legal process do not 'appear' before the district court, as they do not argue cases or sign briefs. They are nevertheless an integral part of the litigation process." *Id.* at 823. The *Winterrowd* court characterized the out-of-state attorney's role as litigation support or consultant, and ultimately held that the plaintiffs may recover for the attorney's work because his conduct did not rise to the level of "appearing" before the district court. *Id.* at 823-824. The out-of-state attorney "never appeared or argued in front of the district court, nor did he sign briefs." *Id.* at 824. Rather, the out-of-state attorney had the role of "advising" and "reviewing pleadings."

Like the attorney in *Winterrowd*, Mr. Joy's role was primarily one of litigation support and consultant, and the legal work he did perform did not rise to the level of appearing before the court. Therefore, Mr. Joy's fees are recoverable to the same extent as outside counsel's fees. Further, the lack of contemporaneous bills does not foreclose an award of fees. *Winterrowd*, 556 F.3d at 827 ("[i]n California, an attorney need not submit contemporaneous time records in order to recover attorney fees"); *Ackerman v. Western Elec. Co., Inc.*, 643 F. Supp. 836, 863 (N.D. Cal. 1986) (in the absence of contemporaneous time records, "the Ninth Circuit requires only that affidavits be sufficient to enable the court to consider all the factors necessary to determine a reasonable attorney's fee award").

Emerson's third objection, however, has some merit. Having reviewed Mr. Joy's declaration, travel logs, notebooks, iConnect log and select e-mails, the Court concurs with the Special Master's finding that Mr. Joy appears to have acted in the role of in-house counsel for a substantial portion of the time he worked with BladeRoom's attorneys. For example, Mr. Joy collected and reviewed contracts, emails, attachments, company manuals and specifications (*see* Joy Decl. ¶ 13); interviewed employees (¶ 13); searched for and reviewed publicly available

materials about how Facebook and Emerson might be using BladeRoom's technology (¶ 14); met with BladeRoom's board and executives regarding the pre-filing investigation (¶ 15); coordinated and participated in meetings with outside counsel (¶ 16); communicated regularly with outside counsel (¶¶ 16, 22, 24, 25); reviewed BladeRoom's confidentiality policies (¶ 17); helped BladeRoom respond to discovery (¶¶ 28-32); helped develop trial strategy and prepare for trial (¶¶ 48, 51, 55); attended every day of trial (¶ 53); and participated in calls with outside counsel to discuss the appellate process and strategy (¶ 59). In-house counsel cannot recover fees for time spent acting as a client "liaison" or "client representative." *See El Dorado Irrigation Dist. v. Traylor Bros., Inc.*, No. 03-949 LKK, 2007 WL 512428, at *5 (E.D. Cal. Feb. 2, 2007) (deducting hours of in-house counsel because party failed to distinguish when counsel was "representing" party as a lawyer and when he was acting as a "client representative"); *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 761 F.2d 553, 558 (9th Cir. 1985) ("Of course, if in-house counsel are not actively participating (e.g., acting only as liaison), fees should not be awarded."); *cf. Scripps Clinic & Research Foundation, Inc. v. Baxter Travenol Labs., Inc.*, No. 87-140-CMW, 1990 WL 146385, at *1 (D. Del. July 31, 1990) ("Fees for in-house counsel are appropriate only when counsel is performing legal work that would otherwise be performed by outside counsel; time spent by in-house counsel in the role of a client, such as time spent keeping abreast of the progress of the litigation and advising outside counsel of the client's views as to litigation strategy, is not compensable in a fee award.").

Mr. Joy also provided substantial technical support, which is more of a traditional in-house counsel role. *See* R&R at 14 (citing Joy Decl. ¶15 ("I also helped set up a data room to enable outside counsel to access relevant documents and conduct interviews and meetings with several potential outside counsel"); ¶19 ("I continued helping the Farella attorneys to better understand BladeRoom's technology and our case. This included sharing and explaining numerous company manuals and specifications . . . ."); ¶40 ("I was heavily involved in helping Farella attorneys work with our technical experts, Mr. Quale and Mr. Brannigan, so that they could explain BladeRoom's

trade secrets in their reports."); ¶41 ("I helped Mr. Andrea and Farella attorneys to provide information for his report and to help him better understand the state of the data center industry")).

The Court agrees with the Special Master's assessment that Mr. Joy also performed legal work that would otherwise be performed by outside counsel. For example, Mr. Joy investigated potential claims, drafted discovery responses, responded to briefs and motions, and prepared witnesses for deposition and trial. This type of work by in-house counsel is ordinarily compensable. *Scott Paper Co. v. Moore Business Forms, Inc.*, 604 F. Supp. 835, 837 (D. Del. 1984) (awarding value of in-house counsel's servicers in-house counsel had "participated throughout these proceedings, attended depositions, and was involved in witness preparation, trial of the case, and brief writing").

Nevertheless, it appears that Mr. Joy's legal work was largely duplicative of the work of the Farella attorneys. Without the benefit of contemporaneous billing records from Mr. Joy (which he was not required to maintain), it is not feasible to identify with specificity the non-duplicative work Mr. Joy contributed to the litigation of this case. *Scripps*, 1990 WL 146385, at *2 (reducing requested in-house fees by fifty percent in part because in-house counsel's "affidavit is helpful in determining the types of tasks he did, but it is not a complete substitute for detailed time records").

Based upon the records and other supporting documentation that is available, the Court finds that the requested $3,379,350.00 for work performed by Mr. Joy is not completely substantiated and to some degree excessive. Emerson's request that Mr. Joy's fees be deducted in full, however, goes too far. Mr. Joy unquestionably played a vital and unique role in this complex litigation. His institutional knowledge was of great value to the prosecution of BladeRoom's case. Mr. Joy's significant contributions to the litigation potentially saved Emerson attorneys' fees because he was able to perform services more efficiently than a host of junior level attorneys with less institutional knowledge and less expertise. The Court finds that a 55% reduction of his fees is appropriate because his work was primarily that of a traditional in-house counsel, and in other

respects, appears to have been duplicative of work performed by the Farella attorneys.  The Court

recognizes the significant support Mr. Joy gave to BladeRoom through the course of the litigation;

however, the Court would have been in a better position to analyze Mr. Joy's fees had there been

greater notation of those fees.  *See  PLCM Group, Inc. v. Drexler*,  22 Cal.4th 1084, 1096 n.4

(2000) ("We note that maintaining contemporaneous records by in-house counsel of hours spent

on a case involving a possible request for attorney fees would facilitate accurate calculation of the

lodestar and minimize possible inaccuracies in reconstructing time spent on a matter months or

even years after the fact.").

Mr. Joy's fees will therefore be reduced to $1,520,707.50.

### b.  Foreign Counsel Fees

BladeRoom seeks $71,744.95 in fees for two outside UK law firms and a UK paralegal.

The Special Master concluded that BladeRoom was not entitled to fees under *Winterrowd*, and

reduced these fees by 40% instead of excising them entirely from BladeRoom's fee award.

Emerson asks the Court to remove the remaining 60% of these fees from the fee award,

contending that all of the UK law firm's fees are not recoverable as a matter of law under

*Winterrowd*.

The Court overrules Emerson's categorical objection to all of the UK law firm's fees for

the reasons discussed above regarding Mr. Joy's fees.

### c.  Block-billing/ Allocation of Facebook Related Fees

The Special Master recommended a 40% reduction of BladeRoom's lodestar in part

because of block-billed entries for work "that included issues unique to Facebook and not

applicable to Emerson, making it impossible to determine how much of this block-billed time

should be discounted and how much should be recoverable."  R&R at 10.  In particular, the

Special Master noted that BladeRoom was seeking over $1.3 million in fees incurred before

Emerson was even named as a defendant.  Emerson was not added as a party until Bladeroom was

granted leave to file the Second Amended Complaint ("SAC") in April of 2016.  Dkt. No. 105.  In

his review of the billing records, the Special Master also identified several other block-billed entries for work relating to Facebook, including but not limited to entries for time spent communicating with and preparing for meet and confer efforts with Facebook counsel, working on BladeRoom's opposition to Facebook's Motion to Dismiss, and propounding and responding to Facebook-specific discovery.

Emerson objects to the R&R in that it does not apportion 50% of the recommended award of $12,272,017 to Facebook. Emerson contends that a 50% apportionment of the fees to Facebook is appropriate based upon the Special Master's findings that "the manner of block billing did not permit delineation of fees, but that the bills included, at least in some places, what appeared to be Facebook only time in the fees sought against Emerson." Emerson's Obj. 3. BladeRoom counters that the 40% across-the-board reduction (or "haircut") recommended by the Special Master is already excessive, and moreover, that this 40% haircut already takes into account the purported lack of apportionment. BladeRoom's Resp. 1. The Court agrees that an apportionment of fees to Facebook is appropriate, but not to the extent Emerson requests.

A fee applicant bears the burden of submitting "evidence supporting the hours worked and rates claimed." *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000). Block-billing is "less than ideal" for meeting this burden, but is not per se objectionable if the descriptions provided are adequate. *See Gilead Scis. v. Merck & Co*, No. 13-4057 BLF, 2017 WL 3007071, at *8 (N.D. Cal. July 14, 2017) ("While block-billing is less than ideal in providing a complete record to assess reasonableness, adequate descriptions can still make it acceptable."). A court has authority to reduce hours that are billed in block format because "it makes it more difficult to determine how much time was spent on particular activities." *Loretz v. Regal Stone, Ltd.*, 756 F. Supp. 2d 1203, 1213 (N.D. Cal. 2010) (quoting *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)).

As a starting point, it bears noting that BladeRoom took significant steps to omit activities from its billing records that pertained to Facebook only:

So the way that we broke it down was if -- you know, anything -- any activities that generated attorneys' fees that had to do with Emerson's wrongdoing, we sought those fees.

Any activities that had to do with wrongdoing committed by Facebook and Emerson together, we sought those fees as well because those activities contributed to the overall success of the case, which is the standard.

Now, for the activities where Facebook engaged in separate independent wrongs, we excluded those fees. Here's how we did it: first, we reviewed the records and we looked for the activities -- for entries that referred only to Facebook.

We reviewed each of those entries to confirm whether or not they related to Facebook-only wrongdoing. And if they did, we did not seek those fees. We highlighted those in the billing records to indicate which ones we were not seeking.

The second thing that we did was we canvassed the entire litigation team that represented BladeRoom, and that included several people who represented BladeRoom from the very first day and they stayed all through the trial, myself included, and we generated a list of search terms, activities, and discovery sought, and theories that we pursued that we knew related only to separate acts by Facebook. We ran those search terms through the billing records, and we reviewed those entries as well. Some of those search terms related to separate discovery that did not relate to Emerson.

For example, Facebook misused BladeRoom's technology in combination with some other third parties and some other Facebook data centers that Emerson did not build for Facebook, [sic] we excluded those time entries.

Some of the search terms related to very specific disputes with Facebook, discovery fights. For example, Facebook filed a motion to try to force BladeRoom to submit a bond late in the case shortly before summary judgment was due. Emerson did not join in that motion. We omitted that time as well.

Just to be clear, when we found an entry, a time entry that included one activity that was directed toward Facebook only wrongdoing, we omitted the entire time entry.

So just to take an example, if there were six hours devoted to a dozen different tasks and one of those tasks had to do with something that wasn't related to Facebook's independent wrongdoing, we omitted the entire six hours.

\* \* \*

When we found a time entry that involves work directed toward a Facebook-only wrongdoing, we omitted the entire time entry. That swept in lots of work that focussed [sic] on Emerson's

wrongdoing and lots of work that focussed [sic] on joint wrongdoings between the defendants.

> We wanted to be conservative, and we wanted to acknowledge the task that guessing how much time was spent within a time entry, how much time was spent on Facebook-only act would be difficult to do, so to be conservative we omitted the entire time entry.

> And Farella, Braun & Martel and BladeRoom identified roughly $1.3 million in fees incurred by Farella that focussed [sic] only on Facebook's wrongdoing that BladeRoom is not seeking to recover.

> Mr. Joy, BladeRoom's in-house counsel, used the same approach to identify his work that related to Facebook-only wrongdoing.

Transcript at 24-27. This culling process led to BladeRoom identifying roughly $1.3 million in fees uncured by Farella that focused only on Facebook's alleged wrongdoing, and which BladeRoom is not now seeking. Transcript at 27. The Court finds counsel's representations above, when combined with the Court's *in camera* review of the billing records and other evidence submitted in support of BladeRoom's fee request, are trustworthy.

### i. Work Performed Before Emerson Was Named A Defendant

The Court agrees with the Special Master's assessment that the 976 pages of billing records include many instances of block-billing. For the most part, the block billing entries are sufficiently descriptive for the Court to assess the reasonableness of the fees requested. The activities captured in the block-billing "are clearly listed and are not unreasonably vague." *Genesis Merch. Partners, LP v. Nery's USA, Inc.*, No. 11-1589 JM (WVG), 2013 WL 12094825, at *4 (S.D. Cal. Dec. 6, 2013). The block entries, however, are problematic for a different reason. In some instances, the block entries make it difficult to determine which entries reflect Facebook only activities from other activities.

Block entries for work completed while Facebook was the only named defendant are particularly problematic. Emerson was not added as a party until Bladeroom was granted leave to file the SAC on April 18, 2016. Dkt. No. 105. The vast majority of these pre-SAC entries do not mention Emerson. Nor do the entries contain sufficient information to determine what portion of

Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEYS' FEES AND COSTS

15

United States District Court
Northern District of California

the pre-SAC block-billed work, if any, pertained to Emerson.

The Court recognizes that some of the work performed before the SAC was filed may be fairly attributable to Emerson because that pre-filing work led to evidence supporting the allegations against Emerson.  Nevertheless, BladeRoom, as the fee applicant, bears the burden of showing that the requested fees were "allowable," that they were "reasonably necessary to the conduct of the litigation," and that they were "reasonable in amount."  *Levy v. Toyota Motor Sales, U.S.A., Inc.*, 4 Cal. App. 4th 807, 816 (1992); *Carson v. Billings Police Dept.*, 470 F.3d 889, 891 (9th Cir. 2006).  BladeRoom has not completely substantiated its request for the fees incurred prior to the filing of the SAC.  A percentage reduction of the requested pre-SAC fees is appropriate to account for the block-billed entries that lack sufficient information for the Court to make an Emerson-Facebook apportionment.  *See Bell v. Vista Unified School Dist.*, 82 Cal. App. 4th 672, 689 (2000) (explaining that court should exercise its discretion in assigning reasonable percentage to block-billed entries, or "simply cast them aside").  The Court concludes that the approximately $1.3 million in fees incurred prior to the filing of the SAC on April 21, 2016 must be apportioned 70% to Facebook and 30% to Emerson.

### ii.  Work Performed After Emerson Was Named A Party & Before Facebook Settled

Whether the fees incurred after the filing of the SAC and before Facebook settled should be apportioned is a separate question.  The Special Master noted, and this Court agrees, that some of Farella's work necessarily related to both Facebook and Emerson because this case revolved around a conspiracy between Facebook and Emerson.  R&R at 10, n.5.  At the hearing, BladeRoom gave a description of the case that was entirely consistent with the Court's observations throughout this lengthy litigation:

> The heart of this case involves a conspiracy between Emerson and Facebook to steal BladeRoom's technology and to build -- to use that technology to build a very large and very expensive data center located in Sweden.  That was the vast majority of the evidence that was presented at trial had to do with that conspiracy. . . . and the culmination of that conspiracy took place in October of 2012 when Facebook approved the design that Emerson presented to it, which was based on stolen BladeRoom technology to build the Sweden data

center, the Lulea 2 data center.

Transcript at 19-22.  The Special Master noted, and the Court agrees, that some of Farella's work relating to the two defendants was intertwined, and ultimately, some of Farella's seemingly Facebook-related work was tied to some of the allegations against Emerson (*i.e.*, defining and ascertaining the extent of protection for BladeRoom's trade secrets, understanding the industry and the context of the technology, investigating the facts surrounding the misappropriation of BladeRoom's trade secrets, and investigating possible defense positions).  *Id.*  For this reason, Emerson's specific objection to fees incurred in connection with the deposition of J. Park is unfounded.  Although in Emerson's view, Mr. Park's deposition would have involved Facebook-only issues, in BladeRoom's view, Mr. Park was an essential witness to the conspiracy:

> Mr. Park was an essential witness to the conspiracy. He was the head of the data center team at Facebook. He directed his subordinates to collaborate with Emerson to steal and copy BladeRoom's technology. And so much of his testimony at trial, much of the documents relating to his activity, much of the deposition would have involved this joint conspiracy.

Transcript at 23.

There are, however, block-billed entries that include work on issues that appear to be specific to Facebook.  The Special Master noted that these entries included work on the following issues:  (1) a breach of contract claim against Facebook alone; (2) at least four separate discovery disputes that exclusively or primarily involved Facebook; (3) significant discovery relating to other Facebook data centers that Emerson did not construct and in no way involved Emerson; (4) a deposition related solely to a Facebook document preservation issue; (5) expert reports and Daubert motions involving Facebook experts; (6) Facebook-only damages claims and issues; and (7) motions in limine that were Facebook issue specific.  R&R at 11.

At the hearing, BladeRoom contended that the Special Master had the wrong focus.  BladeRoom argued that "[t]he issue is not were we pursuing a discovery dispute with Facebook or was the discovery dispute joined or was it with Emerson," but rather "what was the purpose of the activity and did the discovery that was being sought contribute to the overall victory of the case?"

Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEYS' FEES AND COSTS

17

Transcript at 32. BladeRoom reasoned that:

> Even if Facebook had been a third party in this lawsuit and even if BladeRoom had only sued Emerson from the start, it would have needed to pursue lots of discovery from Facebook, [sic] it would have needed Facebook witnesses at trial to prove its claims against Emerson. And so just because we were having meet and confer with Facebook, that -- or Facebook's attorneys rather, that doesn't mean that the activity should be excluded.

*Id.*

BladeRoom's reasoning is sound. Nevertheless, the Special Master noted that the problem with BladeRoom's fee application is that in many instances, the block-billed entries made it difficult (and sometimes impossible) to determine what proportion of the block-billed work had been reasonably spent on Emerson or joint Emerson/Facebook successful claims. The Court agrees with Special Master's assessment in this regard but disagrees as to the extent or pervasiveness of the problem. The Court has carefully reviewed the billing records and has verified that Facebook-only time is not "permeating" the bills, as Emerson suggested during the hearing. Transcript at 17.

In sum, a percentage reduction of the requested fees is appropriate to account for the block-billed entries that lack sufficient information for the Court to make an Emerson-Facebook apportionment. *Bell*, 82 Cal. App. 4th at 689. What that percentage should be is discussed in Section 5 of this Order.

### iii. Work Performed After Facebook Settled

A few days after trial commenced, BladeRoom and Facebook settled. A dismissal was filed on April 9, 2018. Dkt. No. 772. None of the fees incurred for work after April 9, 2018 are subject to apportionment.

### d. BladeRoom's Degree of Success

Emerson contends that the R&R does not take into consideration BladeRoom's "limited success" in the litigation. Emerson's Obj. 3. Emerson points out that the jury found in BladeRoom's favor on only one of the three asserted trade secrets and that BladeRoom voluntarily

dropped twenty other asserted trade secrets before trial. Emerson theorizes that "BladeRoom would have incurred substantially lower fees had it properly tailored the scope of issues at the front end of the litigation." *Id.*

The Court rejects Emerson's argument. The jury awarded BladeRoom $30 million in compensatory damages and found by clear and convincing evidence that Emerson's misappropriation of trade secrets was willful and malicious. Dkt. No. 867. The jury's finding of willful and malicious conduct exposed Emerson to additional liability for exemplary damages under the CUTSA. This Court awarded BladeRoom $30 million in exemplary damages—an amount equal to the compensatory damages awarded by the jury, reasoning as follows:

> Here, the nature of Emerson's misconduct favors an award of exemplary damages, though not in the full amount permitted under CUTSA. This court is intimately familiar with the evidence, having presided over a 21-day jury trial and having since undertaken several additional reviews of the record in conjunction with several post-verdict motions. While the trial evidence was extensive, the conduct relevant to exemplary damages can be condensed down to the following statement: after Facebook expressed to Emerson the desire for a data center consistent with BladeRoom's technology, employees from Emerson (and Facebook) lured BladeRoom into revealing its trade secrets under the guise of a possible data center contract or corporate acquisition, and then used the information it obtained to surreptitiously design and build Facebook's data center at Lulea 2. Contrary to what Emerson argues now, the evidence does not support a series of minor errors in judgment or mistakes which can be remedied with an apology, and Emerson fails to grapple with the broader effects of its misconduct. From a commercial ethics perspective, the misconduct certainly falls within the category of reprehensible; it undermines the confidence market participants can place in confidentiality agreements and causes those who possess trade secrets to seriously question the motivations of those who superficially appear to be interested in legitimate acquisition. The consumer loses as a result, as innovation and competition are stifled while trade secrets are kept buried in the proverbial vault.

> Given its effects on the marketplace, society has a genuine interest in deterring similar misconduct. That need for deterrence is not at its strongest in this case, however, because Emerson's offenses have been exposed to all other participants in the data center market, and indeed to all other participants in other markets in which Emerson has a stake. *See Mattel, Inc.*, 801 F. Supp. 2d at 955. These participants "are likely to cast a wary eye" toward Emerson in all future dealings. *Id.*

Order Granting Request for Exemplary Damages, Fees, Costs and Prejudgment Interest 3-4 (Dkt. No. 956).

In total, BladeRoom was awarded $60 million in damages. This can only be described as an excellent result at trial, especially considering the three years of hard fought litigation preceding trial. That BladeRoom did not pursue or obtain misappropriation findings at trial on all of its trade secrets in no way diminishes BladeRoom's success at trial. *Dang v. Cross*, 422 F.3d 800, 812–13 (9th Cir. 2005) ("[A] plaintiff does not need to receive all the relief requested in order to show excellent results warranting the fully compensatory fee."). Emerson makes much of the fact that the jury did not award all of the damages BladeRoom sought; nevertheless, the sum awarded is substantial and far exceeds the $5 million range for lost profits and $3 million range for unjust enrichment urged by Emerson's expert.

### 3. Emerson's Objection re the Lack of Adversarial Discovery

Emerson objects to the R&R on due process grounds because it was based on the Special Master's *in camera* review of billing records that, despite repeated requests, were not made available to Emerson. Emerson also asserts a due process objection based on BladeRoom's *in camera* submission of Mr. Joy's alleged work product.

The Court overrules these objections because Emerson was later provided with redacted copies of BladeRoom's billing records and Mr. Joy's work product and had an opportunity to object to these records. During the hearing, Emerson repeatedly criticized BladeRoom's redactions of the billing records as excessive, and BladeRoom defended its redactions as necessary to protect counsel's mental impressions or work product. Having conducted a thorough review of the hundreds of pages of billing records, the Court agrees with both parties to some extent. There are instances of excessive redacting and instances of appropriate redacting alike. The excessive redacting is a factor the Court will take into consideration in assessing fees, but ultimately the Court and the parties should be mindful of the Supreme Court's guidance that "the determination of fees 'should not result in a second major litigation.'" *Fox v. Vice*, 563 U.S. 826, 838 (2011)

(quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). "The essential goal . . . is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id.*

Emerson asserts a separate due process objection based upon BladeRoom's "failure to provide a full disclosure of the Facebook settlement agreement and BladeRoom's fee arrangements and payments made to counsel." Emerson's Obj. 3. The Court previously considered and rejected these arguments (Dkt. No. 985) and Emerson does not now offer any new factual or legal basis for reconsideration. These objections are overruled.

### 4. Emerson's Objection re Offset For Facebook Settlement

Emerson objects to any fee award that fails to include an offset based on the Facebook settlement agreement. The objection is overruled.

As a general rule, when one defendant settles with a plaintiff, but another defendant does not, the "non-settling defendant is entitled to offset attorney's fees owed by the amount already paid by settling defendants." *Corder v. Brown*, 25 F.3d 833, 40 (9th Cir. 1994)*; Bravo v. City of Santa Maria*, 810 F.3d 659, 668 (9th Cir. 2016) ("district court abuses its discretion when it refuses to offset an award of attorney fees by a settling defendant's payment of those same fees"). Here, upon entry of the settlement, BladeRoom and Facebook agreed to "bear their own attorneys' fees and costs." Dkt. No. 968 at 19. Counsel for BladeRoom, Jeffrey Fischer, also represented that "BladeRoom's settlement agreement with Facebook did not apportion any money toward attorneys' fees. BladeRoom was required to pay its own attorneys' fees, from its own funds, through the conclusion of the litigation." Supp. Decl. of Jeffrey M. Fisher in Support of BladeRoom's Motion for Fees and Costs ¶ 19 (Dkt. No. 972-2). This is clear and unequivocal evidence that BladeRoom did not receive any attorneys' fees from the Facebook for which offset would be required under *Corder*.

Notwithstanding BladeRoom's evidence, Emerson remains suspicious that BladeRoom used part of the Facebook settlement funds to pay Farella. Emerson persists that it should be

allowed to conduct discovery regarding the Facebook settlement because "it would be helpful if we just learned what Farella was paid after the Facebook settlement was paid." Transcript at 45. In response, BladeRoom repeatedly represented during the hearing that "[e]very cent of what we're seeking that Farella billed to BladeRoom was paid by BladeRoom. Transcript at 19; *see also* Transcript at 20 ("every cent of outside counsel fees that we are seeking here was in fact paid by BladeRoom"). To further dispel any suspicion that the Facebook settlement funds were even indirectly applied to Farella bills, BladeRoom represented that it paid Farella within a roughly thirty day cycle of Farella issuing bills. Transcript at 46; *see also* Supp. Decl. of Fischer ¶ 4 (Dkt. No. 972-2) ("Farella submitted bills to BladeRoom each month, and BladeRoom paid them on a rolling basis."). Therefore, there is no basis for offsetting fees.

### 5. BladeRoom's Objection re 40% "Haircut"

The Special Master recommended a 40% reduction of BladeRoom's fees to "mirror[] the percentage of billing records that the Special Master has identified as problematic." R&R at 19. The Special Master found that the "reduced amount more appropriately represent[ed] BladeRoom's reasonable attorneys' fees in this litigation." *Id*. BladeRoom objects to this "haircut" as "excessive" and because it fails to take into account the nature of this hard fought and time consuming litigation." BladeRoom's Obj. 3. The Court agrees.

As the Special Master observed, this was a "complex, hard-fought case." R&R at 6-7, n. 3. The Special Master's R&R succinctly described the breadth of discovery, motion practice, and trial schedule:

> Discovery was extensive, with nearly 1 million documents totaling over 4.3 million pages produced by the parties and third parties; 58 depositions of 46 different deponents across several U.S. states and two foreign countries; and site inspections of data centers and related facilities in England, Sweden, California, Illinois and Ohio. BladeRoom had to respond to numerous interrogatories from Facebook and each of the three Emerson defendants as well as 157 requests for admission from Emerson. The case also involved extensive motion practice, including four motions to dismiss, three summary judgment motions, seventeen discovery disputes, twenty-two motions in limine and numerous motions made during trial and post-trial, each raising complex issues of fact and law. This all

culminated in a five-week jury trial in which BladeRoom was awarded $30 million, which was followed by post-trial briefing.

*Id.* The one thousand thirty-seven (1,037) entries on the docket sheet are indicative of the frequency with which the Court was called upon to adjudicate disputes. The Court observed first hand the seemingly unlimited resources Emerson and Facebook brought to bear in defense of this action. Eight attorneys made appearances on behalf of Facebook. Facebook described the scope of the litigation as enormous. By October 2017 (months before trial), Facebook had incurred in excess of $13.5 million in fees and costs. Fifteen attorneys from three different firms appeared on behalf of Emerson. In this context, the approximately $20 million in fees is not per se unreasonable.

Although the Special Master cited several legitimate reasons for the 40% haircut, the Court finds that none of the cited reasons, individually or collectively, warrant such a drastic reduction of BladeRoom's fee request. First, the Special Master faulted BladeRoom for duplicative work and inefficient staffing. The Court has reviewed the billing records and agrees with the Special Master that there are instances where the billing records suggest duplicative and inefficient staffing. The Court, however, does not share the Special Master's view that the records "clearly demonstrate that, not only did Farella significantly overstaff this case, but also, its overstaffing lead to across-the-board duplicative and inefficient efforts." R&R at 8. The Special Master did not have the benefit of the years of direct involvement that this Court had. In this Court's view, the work described in BladeRoom's billing records, even if certain entries may appear duplicative or inefficient, was reasonably necessary in the context of this heavily contested and time consuming litigation. The Defendants' legal teams were significantly larger than Farella's team. Emerson and Facebook's combined group of 23 attorneys put on a persistent and aggressive defense, which BladeRoom's core team of six attorneys[4] was forced to meet with an equally persistent and aggressive offensive. Farella's team was comprised of three partners (Jeffrey

---

[4] The Special Master thought Farella's legal team was comprised of five partners and five associates (R&R at 7), when in fact it was comprised of three partners and three associates (BladeRoom's Obj. 5).

Fisher, Stephanie Skaff and Eugene Mar) and three associates (Alex Reese, Julia Kropp and Erik Olson[5]). BladeRoom's Obj. 5. Four other Farella attorneys provided assistance on a limited basis during different periods of the litigation: one partner assisted during double-tracking of expert depositions; two associates were added to the case in the lead-up to trial and were part of the trial team; and one additional associate helped with BladeRoom's fee request. *Id*. In general, Farella staffed the case in a balanced and reasonable manner such that each partner worked with a smaller group of associates to complete various tasks. *Id*. 5-6. During trial, the Court observed that the Emerson legal team significantly outnumbered the BladeRoom team on a daily basis.

There were some instances where partners performed tasks that could have been done by associates or other lower-level timekeepers, such as legal research, brief writing, discovery and document review and the drafting of pre-trial statements and discovery requests. There were also instances where multiple partners worked on the same briefs. Nonetheless, these staffing decisions were not unreasonable in a case of this magnitude and complexity, especially when BladeRoom was litigating against Facebook and Emerson's formidable defense teams. The schedule in the case also dictated that certain tasks be completed quickly. For example, BladeRoom had two weeks to respond to Defendants' motions for summary judgment, and later in the case, ten days to respond to Defendants' thirteen separate motions *in limine*. It is not surprising, nor was it unreasonable, for BladeRoom to pull in every member of its litigation team to help research and prepare responses to these critically important motions. As BladeRoom pointed out during the hearing, litigation can resemble a tennis game or war in that when one side hits the ball or shoots heavy artillery, the other side necessarily spends time hitting the ball or shooting heavy artillery back. Transcript at 82 (citing *Democratic Party of Wash. v. Reed*, 388 F.3d 1281, 1287 (9th Cir. 2004). In short, the Court did not observe "across-the-board duplicative and inefficient efforts" that would justify a 40% reduction of BladeRoom's lodestar.

Second, the Special Master found the 40% reduction was warranted because Farella

---

[5] Mr. Olson was elevated to partnership in January 2018.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEYS'
FEES AND COSTS

attorneys consistently used block billing that made it difficult if not impossible to determine how much time had been reasonably spent on non-Facebook specific work. As discussed previously, an apportionment of fees for Facebook specific work is appropriate. The case can be divided into roughly three phases, only two of which require apportionment: work performed before the SAC was filed (which the Court has already apportioned 70% to Facebook and 30% Emerson); and work performed after the SAC was filed and before Emerson and Facebook settled. No apportionment is required for the third phase (work performed after the settlement). As to the middle phase, a full 40% haircut is not justified. BladeRoom has already reduced its fees by approximately $1.3 million to account for work related only to Facebook. BladeRoom's Obj. 9. Moreover, for the middle phase, much of Farella's work related equally and inextricably to both Defendants. This is because BladeRoom's claims were based in large part on Emerson's interactions with Facebook. From the inception of the lawsuit, BladeRoom alleged that: "Emerson and Facebook had pre-arranged and attended a clandestine meeting among themselves in the UK immediately following their separate visits to BladeRoom in June 2012 at which Emerson and Facebook discussed BladeRoom's technology and what they had each learned from BladeRoom's confidential disclosures to them; and that Facebook partnered with Emerson to build the Lulea 2 data center using BladeRoom's technology." *Id*. 10. These alleged events remained central issues throughout the case.

The Special Master's third basis for the 40% reduction was that BladeRoom was not entitled to recoup fees for work performed by in-house counsel, Mr. Joy. As discussed previously, the Court finds that a 60% reduction of Mr. Joy's fees is appropriate. No further reductions are warranted as to Mr. Joy's fees.

Fourth, the Special Master found that BladeRoom was not entitled to recoup the UK law firm's fees. As discussed previously the UK law firm's fees are compensable and the recommended 40% reduction is not warranted.

Fifth, the Special Master found that BladeRoom was not entitled to recover fees for one

United States District Court
Northern District of California

Case Clerk and two Litigation Support personnel because Farella failed to provide information about their qualifications and experience as required by Local Rule 54-5(b)(3) and most of the work performed by these individuals was "purely clerical or secretarial." R&R at 18. BladeRoom does not challenge this finding. Once again, however, this deficiency does not warrant a drastic 40% reduction to the lodestar.

Although the Court finds that none of the five bases cited by the Special Master, individually or in the aggregate justify a 40% reduction to the lodestar, the Court does find that a 10% reduction to the lodestar is appropriate to account for the deficiencies in the billing records discussed herein, but primarily due to the block-billing.

### 6. BladeRoom's Objection re *Ketchum* Factors

If the Court does not award BladeRoom the entirety of its fee requests, BladeRoom asks that the Court exercise its discretion to adjust the lodestar upwards based on the factors stated in *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001) to award BladeRoom the entire amount of the fees it expended in this litigation. The *Ketchum* factors are: (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, and (4) the contingent nature of the fee award. *Ketchum*, 24 Cal. 4th at 1132 (citing *Serrano v. Priest*, 20 Cal.3d 25, 48 (1977) ("*Serrano III*")).

Having considered the relevant factors[6], the Court declines to adjust the fee award upwards. The first two *Ketchum* factors are already encompassed within the lodestar, and therefore an enhancement based on those factors would result in a form of "unfair double counting." *Ketchum*, 24 Cal. 4th at 1138 ("We emphasize that when determining the appropriate enhancement, a trial court should not consider these factors to the extent they are already encompassed within the lodestar."). Next, BladeRoom represents that the intensity and complexity of the litigation often required nearly all of BladeRoom's trial team's time, effectively

---

[6] BladeRoom does not contend that the fourth *Ketchum* factor warrants enhancement.

Case No.: 5:15-cv-01370-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEYS' FEES AND COSTS

precluding other employment by many of the trial team members. The Court appreciates that this case was very intense and time consuming. Nevertheless, BladeRoom has not shown that the case actually precluded other employment. Therefore, the third factor does not warrant an upward enhancement. *See e.g. Jadwin v. Cty. of Kern*, 767 F. Supp. 2d 1069 (E.D. Cal. 2011) (rejecting reliance on this factor where "Plaintiff's counsel have not provided any specific examples for work they turned away"); *Robbins v. Alibrandi*, 127 Cal. App. 4th 438, 454 (2005) (reversing enhancement where "[t]here [was] no showing that the firm employed by plaintiffs in fact was forced to turn away other work because of this case").

### 7. BladeRoom's Objection re Lodging Costs

BladeRoom incurred $299,534.32 for lodging costs during trial. These costs included a block of rooms at the Fairmont Hotel in San Jose for attorneys and witnesses. The block of rooms consisted of thirteen rooms for Farella attorneys and trial support staff, nine rooms for BladeRoom employees, witnesses and graphics and trial technician consultants, and five rooms for work space. The Special Master recommended that only $29,165.34 be taxed as costs for lodging individuals on BladeRoom's witness list. BladeRoom contends that it is entitled to reimbursement for all of its lodging costs pursuant to California Civil Procedure Code § 1033.5(c)(2). The Court disagrees.

Title 28 U.S.C. § 1920, Federal Rule of Civil Procedure 54, and Civil Local Rule 54-3 govern in this case, and none of them allows for the recovery of lodging or hotel expenses for attorneys and other members of the trial team. *Self v. FCA U.S. LLC*, No. 17-1107 SKO, 2019 WL 1994459 (E. D. Cal. May 6, 2019) (applying federal procedural law governing and disallowing lodging costs). The cases relied upon by BladeRoom are unpersuasive because the parties in those cases did not raise the *Erie* question of whether state law governs. *See Genesis Merch. Partners, LP v. Nery's USA, Inc.*, No. 11-1589 JM (WVG), 2013 WL 12094825, at *10 (S.D. Cal. Dec. 6, 2013) (noting that, "[w]hile not specifically allowed under Section 1033.5, courts have authorized out-of-town travel expenses where reasonably necessary to conduct litigation," and granting costs for an attorney's out-of-town travel and meals); *Page v. Something*

*Weird Video*, 960 F. Supp. 1438, 1447 (C.D. Cal. 1996) (granting travel costs for New York attorney to attend hearings in California, based on section 1033.5); *Okada v. Whitehead*, No. 15-1449 JLS, 2017 WL 2626990, at *5 (C.D. Cal. June 12, 2017) (granting travel costs under section 1033.5).

The Court adopts the Special Master's recommendation that only $29,165.34 be taxed as costs for lodging individuals on BladeRoom's witness list.

### 8.    Special Master's Fees

The Special Master's fees total $32,854.  The Special Master recommended that BladeRoom and Emerson each pay half of his fees.  Federal Rule of Civil Procedure 53(g)(3) provides:

> (3) Allocating Payment. The court must allocate payment among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master. An interim allocation may be amended to reflect a decision on the merits.

Fed. R. Civ. P. 53(g)(3).  The Court has considered the factors above.  The Court agrees with the Special Master's observation that neither party was more responsible than the other for the reference to the Special Master.  Accordingly, the Court adopts the Special Master's recommendation that the parties each pay fifty percent of the fees.

## III.    Conclusion

The R&R of the Special Master is adopted as an order of the Court, with the following modifications:

1.    BladeRoom is awarded $1,520,707.50 for Mr. Joy's fees without any further reductions.

2.    BladeRoom is award $71,744.95 in fees for two outside UK law firms and a UK paralegal, less 10%, for a total of $64,570.45.

3.    BladeRoom is awarded 30% of the fees incurred prior to the filing of the SAC without any further reductions.

1      4.      BladeRoom is awarded all fees incurred after the filing of the SAC and before

2  Facebook settled, less 10%.

3      5.      BladeRoom is awarded all fees incurred after Facebook settled on April 9, 2018,

4  less 10%.

5          BladeRoom shall calculate the deductions ordered above, prepare a proposed order that

6  specifies a total fee award and a total cost award consistent with the R&R and this Order, and

7  submit the proposed order to the Court after obtaining Emerson's approval as to form no later than

8  April 20, 2020.

9          The parties shall each pay fifty percent of the Special Master's fees.

10         **IT IS SO ORDERED.**

11  Dated:  April 6, 2020

12  _____

13                              EDWARD J. DAVILA
                              United States District Judge

United States District Court
Northern District of California